UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RAMON, by and through next friend, G.C.; THOMAS, by and through next friend, C.G.; CAMERON, by and through next friend, B.E.; ANTHONY; and WENDY, on behalf of themselves and those similarly situated,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>JULIET CHARRON, in her official capacity as Director, Idaho Department of Health and Welfare; SASHA O'CONNELL, in her official capacity as Deputy Director, Idaho Department of Health and Welfare; ROSS EDMUNDS, in his official capacity as Administrator, Division of Behavioral Health,<br><br>　　　　Defendants. | Case No. 1:25-cv-00676-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

　　　　Pending before the Court is Plaintiffs' Motion for Temporary Restraining Order (TRO) (Dkt. 4). Plaintiffs seek emergency temporary injunctive relief requiring Defendants to continue providing Assertive Community Treatment ("ACT") services to Plaintiffs and "all others currently receiving these services across Idaho" (Dkt. 4-1 at 3). Defendants include Juliet Charron, the Director of the Idaho Department of Health and Welfare ("IDHW"); Sasha O'Connell, IDHW's Deputy Director; and Ross Edmunds, IDHW's administrator for the Division of Behavioral Health. For the reasons discussed below, the Court finds Plaintiffs have failed to make a clear showing they are entitled to a TRO and denies their motion for an ex parte TRO.

**MEMORANDUM DECISION AND ORDER - 1**

## BACKGROUND

Plaintiffs are five Medicaid beneficiaries (or their guardians) who have significant mental illness and receive ACT services. According to Plaintiffs, ACT "is a federally recognized, evidence-based, community-focused intervention model designed to treat the highest-acuity patients with mental illness such as schizophrenia, bipolar disorder with psychosis, severe and persistent mental illness with anosognosia (basically, the inability of an individual to perceive their own mental illness), and a history of failure with traditional mental health service models" (Dkt. 1 at ¶ 5).

Plaintiffs explain that ACT "is a unique model of bundled care that provides comprehensive services to patients with serious mental health illnesses" (Dkt. 4-1 at 3). It "provides integrated care," which "relies on a team of service providers working cooperatively to treat individual patients," and those "[m]ultidisciplinary team members coordinate with each other to develop an individualized service plan for each patient" (*id.* at 4). Plaintiffs describe ACT as "the treatment of last resort" (*id.*). They allege "about 400 to 500 people across the state" receive ACT services (Dkt. 1 at ¶ 8).

In July 2024, the Centers for Medicare & Medicaid Services at the Department of Health and Human Services approved an amendment to Idaho's Medicaid plan to add ACT services (Dkt. 4-1 at 5). IDHW contracts with Magellan Healthcare (Magellan) to administer the Idaho Behavioral Plan, which offers services such as ACT to Idaho Medicaid patients (Dkt. 1 at ¶ 153). In turn, Magellan contracts with Idaho healthcare providers and reimburses them for providing ACT services to Medicaid-eligible patients (*id.* at ¶¶ 154-55).

Plaintiffs allege that Magellan issued a notice to ACT providers on October 31, 2025, indicating it would no longer recognize bundled reimbursement after December 1, 2025 (*id.* at

¶ 172). Plaintiffs contend that ACT cannot function without bundled reimbursement and that ACT services will cease statewide on December 1 because of Magellan's notice (*id*. at ¶¶ 173-76). Further, Plaintiffs allege "upon information and belief" that Defendants "either directed or authorized Magellan's purported unbundling of ACT services" and, regardless, "have ultimate responsibility for administering the Medicaid program in Idaho in accordance with applicable law" (*id.* at ¶ 180).

On November 26, 2025, Plaintiffs filed this action, alleging two claims under 42 U.S.C. § 1983 for violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 (Dkt. 1). Further, Plaintiffs filed a motion for injunctive relief, including a TRO to require Defendants to continue providing ACT services (Dkts. 4, 4-1). Plaintiffs allege "Defendants' failure to provide timely, statewide access to ACT services on December 1, 2025," will cause "devast[ating] impacts" and "cascading negative consequences" for Plaintiffs and their families (Dkt. 1 at ¶ 182).

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may obtain injunctive relief before final judgment in certain limited circumstances. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A preliminary injunction and a TRO generally serve the same purpose of "preserv[ing] the status quo ante litem pending a determination of the action on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980); Fed. R. Civ. P. 65. Both are extraordinary remedies that should be awarded only "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. 7, 22 (2008). A key difference between a TRO and a preliminary injunction is a TRO's duration. A TRO typically does not last for more than fourteen (14) days without good cause, while a preliminary injunction may extend

MEMORANDUM DECISION AND ORDER - 3

until the end of the lawsuit, which could be months, if not years. *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156 n.1 & n.2 (D. Or. 2018). Thus, the consideration required by a TRO determination is not meant to replace the "thorough consideration contemplated by full proceedings pursuant to a preliminary injunction." *Oby v. Clear Recon Corp.*, 2016 WL 3019455, at *1 (E.D. Cal. May 26, 2016).

For either, the movant must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest." *Winter*, 555 U.S. at 20. When the government is a party, the factors regarding public interest and equities merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The movant must carry his burden "by a clear showing." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

The Court may apply a "sliding scale" standard, "allowing a stronger showing of one element to offset a weaker showing of another." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (2011)). Under this approach, "serious questions going to the merits" and a hardship balance that "tips sharply toward the plaintiff can support issuance of an injunction." *Alliance for the Rockies*, 632 F.3d at 1131; *see also N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). A "serious question" is one that "cannot be resolved one way or the other at the hearing on the injunction because [it requires] more deliberative investigation." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

A preliminary injunction can take two forms. The first, a "prohibitory" injunction, logically "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873,

878 (9th Cir. 2009) (quotation marks and citation omitted). In contrast, a "mandatory" injunction, "goes well beyond simply maintaining the status quo" and "is particularly disfavored" because it "orders a responsible party to take action." *Id.* at 879. The relevant "status quo" for purposes of an injunction "refers to the legally relevant relationship *between the parties* before the controversy arose." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014); *see also Regents of Univ. of California v. Am. Broad. Companies, Inc.*, 747 F.2d 511, 514 (9th Cir. 1984) (for purposes of injunctive relief, the status quo means "the last uncontested status which preceded the pending controversy") (cleaned up).[1]

The Court recognizes a plaintiff's "ability to demonstrate a likelihood of success on the merits, or serious questions going to the merits, is the most important element of a preliminary injunction." *Roe by & through Roe v. Critchfield*, 2023 WL 5146182, at *4 (D. Idaho Aug. 10, 2023) (cleaned up). This showing, however, is only *preliminary* because the parties have typically not engaged in any discovery by the time a plaintiff files a preliminary injunction motion. A TRO that precedes a preliminary injunction is even more removed from the case's merits and substance *Id.* In other words, a plaintiff's request for a TRO asks the Court "to make a pre-preliminary call on the prospects of Plaintiffs' claims." *Id.*

Rule 65(b) permits a court to issue a temporary restraining order without notice to the adverse party only if two independent requirements are met. First, the movant must show, through

---

[1] *See Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) ("The status quo to be preserved by a preliminary injunction [] is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy.") (cleaned up); *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.") (cleaned up).

**MEMORANDUM DECISION AND ORDER - 5**

"specific facts in an affidavit or a verified complaint," that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Second, the movant's attorney must certify in writing any efforts made to give notice and the reasons why it should not be required. *Id*. at (b)(1)(B).

## ANALYSIS

### A.     Likelihood of Success On the Merits

The gravamen of Plaintiffs' complaint is that Defendants either directed, authorized, or allowed Magellan's "unbundling of ACT services," and as result, Plaintiffs' providers will not be able to provide those services (Dkt. 1 at ¶¶ 180-81). Plaintiffs' allegation that Defendants have caused the "unbundling," however, is based only on "information and belief" (*id.* at ¶ 180). Plaintiffs offer no allegations about Defendants' involvement in any decision to "unbundle" ACT services.

The absence of allegations about Defendants' involvement in ceasing ACT services is compounded by the lack of factual support for Plaintiffs' assertion that ACT services will indeed cease on December 1, 2025. For example, Plaintiffs have not submitted Magellan's October 31, 2025, notice informing providers of the "unbundling" beginning December 1 or any factual support for their assertion that Magellan and state officials "confirmed ACT services will terminate" "in meetings held earlier this week" (Dkt. 4-1 at 10-11).

Further, Plaintiffs have not submitted the declaration of any provider attesting that they have received notice of the "unbundling"; they cannot provide ACT services under Magellan's new billing requirements; and they will cease providing services as alleged on December 1. Finally, Plaintiffs have not shown that they have received notice their ACT services will terminate as alleged. Rather, their declarations state only that each "was recently informed that funding for the

MEMORANDUM DECISION AND ORDER - 6

ACT services *may* be cut" (Dkt. 3-1 at ¶ 22; Dkt. 3-2 at ¶ 19; Dkt. 3-3 at ¶ 20; Dkt. 3-4 at ¶ 21; Dkt. 3-5 at ¶ 21) (emphasis added). While Plaintiffs state Magellan representatives have called "individual patients to tell them that they will no longer have access to ACT services after the holiday weekend, effective Monday, December 1, 2025" (Dkt. 4-1 at 2), none of Plaintiffs' declarations provide this information. For these reasons, Plaintiffs are not likely to succeed on the merits on this factual record. *See* Fed. R. Civ. P. 65(b)(1)(A) (requiring showing of "specific facts in an affidavit or a verified complaint" that "immediate and irreparable injury, loss, or damage will result").

Moreover, the legal underpinnings of Plaintiffs' claims under § 1983 are questionable. Plaintiffs allege Defendants' conduct of authorizing, directing, or allowing ACT services to cease violates the public services portion of the ADA (i.e., Title II) and the RA. In support of these claims, they rely on *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), and *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012) (*see, e.g.*, Dkt. 1 at ¶¶ 206, 219; Dkt. 4-1 at 11-12). Both these cases (and others on which Plaintiffs rely) address claims brought directly under the ADA and the RA. *Olmstead*, 527 U.S. at 587; *Dreyfus*, 697 F.3d at 720; *Siino v. City of New York*, No. 14-cv-7217-MKB-LB, 2020 WL 3807451, at *12 (E.D.N.Y. Feb. 27, 2020).

In contrast, Plaintiffs offer no explanation and cite no authority for bringing their claims under § 1983 instead of under the ADA or the RA. The Ninth Circuit has held that a plaintiff cannot bring an action under § 1983 against a state official to vindicate his rights under the ADA or the RA. *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002). Based on this authority, Plaintiffs' claims appear legally deficient as pled.

Perhaps Plaintiffs have good reason for asserting § 1983 claims instead of claims under the ADA and the RA. The Court, however, is unable to determine the reason for Plaintiffs' reliance on

**MEMORANDUM DECISION AND ORDER - 7**

§ 1983 on the current record and the abbreviated timeline. For this reason, the Court cannot conclude Plaintiffs' § 1983 claims are likely to succeed on the merits, even assuming Plaintiffs had provided sufficient factual support for their allegations. The Court expresses no opinion on whether Plaintiffs can cure these defects with amendments or citation to additional authority.

**B.      Irreparable Harm**

Plaintiffs' declarations credibly describe significant mental-health issues and legitimate concerns if ACT services cease. The loss of mental-health services, such as ACT services, may constitute irreparable harm when such loss poses a likely and imminent risk of institutionalization. *See Dreyfus*, 697 F.3d at 733. As noted above, however, Plaintiffs have not established ACT services will actually cease on December 1, 2025. Further, they also have not provided evidentiary support, such as a declaration from a medical care provider, describing the imminent medical harm Plaintiffs will suffer without ACT services. Without evidence that ACT services will actually cease and the medical consequences of that cessation, the Court cannot conclude Plaintiffs will suffer imminent harm before Defendants can be heard.

**C.      Balance of Equities and Public Interest**

If ACT services were imminently ceasing, the balance of equities would favor Plaintiffs. The record, however, does not presently confirm or necessarily even support that outcome. TROs require a particularly strong showing; courts must ensure that relief is narrowly tailored and supported by evidence; and Medicaid program administration requires clarity and accurate information. The Court is unable to tailor narrow relief ensuring ACT services based on the existing record.

Moreover, there is a suggestion an action, which raises the issues Plaintiffs raise in this case, is already pending in state court. If that is the case, then this Court may be required to abstain

from ruling in this case, depending on the nature of any state court action. Accordingly, the Court cannot conclude that immediate, ex parte relief is warranted.

## ORDER

IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion for Temporary Restraining Order (Dkt. 4) is **DENIED** without prejudice;

2. Defendants shall respond to Plaintiffs' motion for preliminary injunction by **December 9, 2025**;

3. Plaintiffs may reply by **December 13, 2025**; and

4. The Court will hold a hearing on Plaintiffs' motion for preliminary injunction on **December 19, 2025**, at **11:00 a.m.** in the United States Courthouse in Boise, Idaho, Courtroom 2.

DATED: December 01, 2025

Amanda K. Brailsford
U.S. District Court Judge