Jeffrey S. Beelaert, Idaho Bar No. 12384
Preston N. Carter, Idaho Bar No. 8462
Don Z. Gray, Idaho Bar No. 10070
Megann E. Meier, Idaho Bar No. 11948
GIVENS PURSLEY LLP
601 West Bannock Street
P.O. Box 2720
Boise, Idaho 83701-2720
Phone: (208) 388-1200
Fax: (208) 388-1300
jbeelaert@givenspursley.com
prestoncarter@givenspursley.com
dongray@givenspursley.com
mem@givenspursley.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RAMON, by and through next friend, G.C.; THOMAS, by and through next friend, C.G.; CAMERON, by and through next friend, B.E.; ANTHONY; and WENDY, on behalf of themselves and those similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>JULIET CHARRON, in her official capacity as Director, Idaho Department of Health and Welfare; SASHA O'CONNELL, in her official capacity as Deputy Director, Idaho Department of Health and Welfare; ROSS EDMUNDS, in his official capacity as Administrator, Division of Behavioral Health,<br><br>    Defendants. | Case No. 1:25-cv-00676-AKB<br><br><br>**AMENDED COMPLAINT – CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## Introduction

1.    The State of Idaho provides for the care and treatment of hundreds of people with severe mental illnesses across the state through a program that offers "Assertive Community Treatment" services.  ACT services have a proven record of success for patients with severe mental illnesses who have not responded well to traditional mental health treatment methods.  Essentially, ACT services act as a treatment regime of last resort for hundreds of patients who, without comprehensive bundled services, likely would find themselves at severe risk of institutionalization or prolonged hospitalization.

2.    To comply with the anti-discrimination provision contained in the public services portion (Title II) of the Americans with Disabilities Act, the individual government-official defendants must provide community-based treatment services to plaintiffs as eligible patients with mental disabilities when the State's own professionals and leaders have determined that such treatment is appropriate, the plaintiffs do not oppose such treatment, and placement can be reasonably accommodated in the community, taking into account the resources available to the State and the needs of others with mental disabilities.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999).

3.    Continuing to provide Assertive Community Treatment services will save Idaho money because the ACT treatment program is designed specifically to help patients with severe mental illnesses *avoid* prolonged hospitalization and unnecessary institutionalization.  The goal for every ACT team is to work closely with each individual patient to provide personalized and holistic support designed to set the patient up for success within the local community, whether that involves help with mental illnesses, housing, employment, education, transportation, or other needs.

4.    Plaintiffs seek declaratory and injunctive relief to compel the government-official defendants to comply with the Americans with Disabilities Act and with the Rehabilitation Act.  This Court should enter an order requiring the defendants to continue to provide Assertive Community Treatment services to plaintiffs and to individual class members similarly situated.  Plaintiffs need these services to effectively treat their mental health illnesses and to avoid prolonged hospitalizations and unnecessary institutionalization.

5.    Assertive Community Treatment is a federally recognized, evidence-based, community-focused intervention model designed to treat the highest-acuity patients with mental illness such as schizophrenia, bipolar disorder with psychosis, severe and persistent mental illness with anosognosia (basically, the inability of an individual to perceive their own mental illness), and a history of failure with traditional mental health service models.

6.    In short, Assertive Community Treatment is "a community mental health treatment model for people with serious mental illness."  Gary R. Bond & Robert E. Drake, *The critical ingredients of assertive community treatment*, WORLD PSYCHIATRY (June 4, 2015).[1]  ACT is a well-established form of noninstitutional care, and it works not only in Idaho but across the entire United States and around the world.

7.    Instead of waiting for patients with serious mental illness to show up to appointments on their own, or to be compelled to do so at state-run institutions, authorized ACT service providers focus on "*assertive outreach*" in the local community, allowing medical professionals and support staff to engage individual patients who are "reluctant to keep appointments at a clinic."  *Id.*  And, unlike traditional treatment methods, the ACT model relies on "a *holistic approach* to

---

[1] Available at:  https://pmc.ncbi.nlm.nih.gov/articles/PMC4471983/.

services, helping with illness management, medication management, housing, finances, and anything else critical to an individual's community adjustment." *Id.*

8.     Here in Idaho, ACT services have been designed "to treat patients with persistent, severe mental health issues who have struggled in traditional treatment options."  Kyle Pfannenstiel, *Idaho Medicaid contractor to cut critical services for people with severe mental illness*, IDAHO CAPITAL SUN (Nov. 21, 2025).[2] "About 400 to 500 people across the state are on the program." *Id.*

9.     Yet these patients are now at risk of losing access to these critical services and ending up institutionalized.

10.     If the State of Idaho were to eliminate ACT services currently being provided to plaintiffs and to other individuals similarly situated across the state, Idaho likely will be "shifting costs to jails and psychiatric hospitals, which are more expensive." *Id.* But it is not merely the threat of increased costs to jails and hospitals.

11.     There is a real risk to public safety if ACT services are not available for the patients who desperately need them and who now depend on them.  "Executive Director of the National Alliance on Mental Illness Idaho Beth Markley said the cuts will be *devastating*." *Id.* (emphasis added).  That devastation affects not only individual patients suffering from severe mental illnesses but also innocent Idahoans who likely will face an increased risk of harm.

12.     The government-official defendants either directed or authorized the State's contractor to change the administration of the ACT program in Idaho.  But their actions were unlawful, and this Court should grant relief to the plaintiffs.  ACT services must continue.

---

[2] Available at:  https://idahocapitalsun.com/2025/11/21/idaho-medicaid-contractor-to-cut-critical-services-for-people-with-severe-mental-illness/.

## Jurisdiction and venue

13.    This action arises under the Americans with Disabilities Act and the Rehabilitation Act.  The Court has jurisdiction over these claims under 28 U.S.C. § 1331 (federal question jurisdiction).

14.    There now exists between the parties an actual, justiciable controversy within the meaning of the Declaratory Judgment Act.  In this civil action, the Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

15.    "Further necessary or proper relief," including injunctive relief, also may be granted by this Court "against any adverse party whose rights have been determined" in a declaratory judgment.  *Id.* § 2202.

16.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the defendants reside in Idaho, and a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in this district.

## Parties

### Individual plaintiffs with mental health disabilities

17.    Plaintiff **RAMON** is currently twenty-six years old, and he lives with his mother and sister in Idaho.  He brings this action through his sister, C.G.

18.    C.G. currently has a power of attorney, and she is authorized to share Ramon's medical information.

19.    Ramon struggles with mental health conditions that significantly impair his day-to-day functioning at home and in the community.

20.    Around the age of thirteen, Ramon was diagnosed with paranoid schizophrenia.

21.    The symptoms of Ramon's disease make it very difficult for him to maintain healthy relationships and an active normal involvement in his community.

Among other things, Ramon suffers from acute psychosis, auditory hallucinations, and delusions.

22.    Ramon has always struggled to manage his disease.

23.    At the age of fifteen, Ramon was incarcerated at a Juvenile Correction Center and was later imprisoned at the age of nineteen.

24.    When Ramon was released from prison, his mental health condition led him to homelessness, unemployment, and an inability to function independently.

25.    In the past, Ramon's symptoms made it very difficult for his family (especially his mother and his sister) to engage with him in a normal and safe manner.  Ramon's condition often caused his family and others to fear him.

26.    Ramon has suffered from an inability to adhere to various traditional mental health treatment plans.  Over the years, Ramon tends either to forget or to refuse to pick up and to take his medications on time.

27.    Sometime around January 2025, while Ramon was incarcerated, Ramon was referred to the Assertive Community Treatment program.  Ramon started receiving ACT services from a provider under the Idaho Behavioral Health Plan.  He now has a team of integrated counselors, employment specialists, substance abuse specialists, peer support individuals, and medical providers working together to provide these services to him.

28.    Since receiving ACT services, Ramon's symptoms dramatically have improved.

29.    Among other things, ACT services provide Ramon with a comprehensive support system including counselors, employment specialists, substance abuse specialists, psychologists, and care providers.  His team of providers help Ramon manage his medications and help give him the tools to manage his disease.

30.    ACT also has been instrumental in reuniting Ramon with his family. Before receiving ACT services, his family relationship had been severed.  After

Ramon started receiving ACT services, his family accepted him back into their home. Ramon is a new person. He has leveled out, is consistent with his medications, and follows through with his ACT treatment and management plans.

31. Since receiving ACT services, Ramon has not been incarcerated, hospitalized, or institutionalized, which is quite a change for him given his prior pattern of incarceration and hospitalization.

32. The ACT team helps Ramon navigate his legal and health issues in a comprehensive manner, and his sister has witnessed firsthand Ramon's near-constant growth through this program.

33. Any cuts to Ramon's ACT services drastically will impact his ability to continue to manage his disease. There is a serious risk that Ramon will be institutionalized if he no longer were able to receive the ACT services required under the Idaho Behavioral Health Plan.

34. Without ACT services, Ramon will lose access to an immediate crisis team, and he will be at an increased risk of having violent and disruptive episodes that most likely will lead to incarceration, hospitalization, and institutionalization. Without ACT, Ramon will be subject to an increased risk of institutionalization that otherwise could be prevented.

35. Plaintiff **THOMAS** is currently thirty-two years old, and he lives in an assisted living facility in Idaho. He brings this action through his mother, C.G.

36. Thomas has been diagnosed with mental health conditions that significantly impair his day-to-day functioning at home and in the community.

37. When he was a teenager, Thomas began showing early signs of mental illness, including paranoid delusions.

38. When he began college, Thomas experienced increased delusions. He was later diagnosed with schizophrenia and a co-occurring substance use disorder.

39.     The symptoms of these diseases make it very difficult for Thomas to maintain healthy relationships and active normal involvement in his community. Among other things, Thomas suffers from paranoid delusions, thoughts of grandiosity, and psychotic episodes.

40.     Since receiving his diagnosis, Thomas has been admitted to a State Hospital approximately ten times.  This pattern of institutionalization often occurred as a result of psychotic episodes and subsequent inability to care for himself, which led to repeated episodes of homelessness.

41.     Thomas has a history of non-adherence to traditional medication routines.  He has struggled in the past with staying consistent with his medications because he has often felt over or under medicated in traditional programs.  This has caused Thomas to fall into a cycle of illicit substance use to self-medicate.

42.     When the symptoms of his disease are present, it is very difficult for Thomas to maintain any sort of traditional outpatient treatment.  He has a history of not showing up for appointments, not adhering to his medication schedules, and not following through with formal substance abuse treatment.

43.     Before this year, Thomas's prior treatment plans have been disjointed and unorganized.  In the past, his various counselors, psychologists, and medical providers were not communicating with one another under a traditional treatment model.  Thomas had the impression that no one was coordinating his care.

44.     In or around June 2025, Thomas was introduced to the Assertive Community Treatment program.  Thomas started receiving ACT services through a provider under the Idaho Behavioral Health Plan with an integrated team of counselors, employment specialists, substance abuse specialists, peer support individuals, and medical providers.

45.     With the ACT services, Thomas's treatment plan is coordinated, and Thomas trusts his team of providers and peer support individuals.

46.     Since receiving ACT services, Thomas's life drastically has changed for the better.

47.     The ACT services provide Thomas a comprehensive, consistent treatment plan and support.  And the ACT services help provide Thomas an intensive community support and assertive engagement program directly in his living environment.    He   thus   avoids   the   threat   of   unnecessary   and   costly institutionalization.

48.     Through   ACT   services,   Thomas   receives   help   with   medication management, comprehensive counseling services, peer support, and medical coordination with his various providers, including for his non-mental health and physical needs.

49.     Since receiving ACT services, Thomas has been on a path where he can be at peace in his own mind, stay sober, and not be afraid or paranoid.  This is critical for   Thomas   to   live   successfully   at   the   assisted   living   facility   and   to   avoid institutionalization.

50.     Through ACT, Thomas has near immediate access to a crisis team that will respond when he is having a bad day or if he is on the brink of a psychotic episode. Thomas relies on this immediate service to help him avoid a mental health crisis.

51.     ACT services have been life-changing for Thomas.  He has not been re-institutionalized, and his family credits ACT services for his improved quality of life.

52.     Without ACT services, Thomas will lose access to the comprehensive support team that he has come to rely upon.  Thomas likely will be re-hospitalized or re-institutionalized without ACT services.

53.     Plaintiff **CAMERON** is currently thirty-one years old and is currently institutionalized in a State Hospital in Idaho.  He brings this action through his father and legal guardian, B.E.

54.    Cameron struggles with mental health conditions that significantly impair his day-to-day functioning at home and in the community.

55.    In his teens, Cameron struggled with his sense of gender identity, and as a result, was occasionally suicidal.

56.    When he was a very young adult, Cameron was diagnosed with schizoaffective disorder, bipolar type.

57.    The symptoms of Cameron's disease make it very difficult for him to maintain healthy relationships and an active normal involvement in his community. Among other things, Cameron suffers from thoughts of grandiosity and what can only be described as a god-complex.

58.    Throughout his twenties, Cameron struggled to manage his disease.

59.    Cameron routinely refused to take his medications and often refused to voluntarily report to appointments under a traditional treatment model.  This put a significant strain on his relationship with his father (B.E.).

60.    While Cameron is generally not a dangerous person, he had episodes where he became so angry about his medications that he was physically violent with his parents.  Cameron also has suffered occasional episodes of believing that he was possessed or overtaken by demons, and that caused him to have thoughts of harming others.  Cameron has a history of taking out his anger or frustration on various objects.

61.    In the past, Cameron suffered through periods of homelessness, incarceration, and institutionalization. Cameron has been hospitalized in various behavioral health hospitals and has been institutionalized in a State Hospital twice.

62.    Cameron has been arrested for various minor offenses, including charges associated with his periods of homelessness.

63.    In or around January or February 2025, Cameron was introduced to the Assertive Community Treatment program through a provider under the Idaho

Behavioral Health Plan. Cameron started receiving the ACT services, which involve an integrated team of counselors, employment specialists, substance abuse specialists, peer support individuals, and medical providers.

64.    Since receiving ACT services, Cameron's symptoms have improved.

65.    Through ACT, Cameron has near immediate access to a crisis team that will respond whenever he is in need. The team has succeeded in circumstances in which other traditional treatments for Cameron have not.

66.    The ACT team has worked with Cameron to help manage his medications and to develop appropriate coping skills and methods to deal with his disease.

67.    Since receiving ACT services, Cameron has been able to reengage with his father in a more appropriate and healthy relationship.

68.    Cameron now trusts the ACT team, and that is critical to his well-being and his continued ability to adhere to the ACT treatment plan. Before ACT, it was nearly impossible to get Cameron to adhere to a traditional medication schedule or to show up voluntarily to appointments. This has drastically improved since Camerson has been receiving ACT services.

69.    Although Cameron is currently in a State Hospital, ACT services have kept him from being more frequently institutionalized.

70.    Cameron's father recently learned that funding for ACT services will be cut effective December 1, 2025.

71.    B.E. is very concerned that these cuts will have a dramatically negative effect on Cameron and his continued well-being. Cameron is at risk of institutionalization if he cannot continue to receive ACT services under the Idaho Behavioral Health Plan.

72.    Without ACT services, Cameron will lose access to an immediate crisis team, and he will be at an increased risk of having violent and disruptive episodes

that inevitably will lead to his incarceration, hospitalization, and/or institutionalization. Without ACT, Cameron will be subject to increased institutionalizations that otherwise could be avoided.

73. Plaintiff **ANTHONY** is currently forty years old. He lives in Idaho.

74. Anthony has been diagnosed with multiple mental health conditions that significantly impair his day-to-day functioning at home and in the community.

75. When he was in grade school, Anthony was diagnosed with attention-deficit/hyperactivity disorder (ADHD), but he still felt that something was wrong.

76. When he was in his twenties, Anthony was diagnosed at various times with Schizophrenia, Bipolar types 1 and 2, and Dissociative Identity Disorder. He has since been diagnosed with Schizoaffective Disorder, Bipolar Type.

77. The symptoms of these diseases make it very difficult for Anthony to maintain healthy relationships and an active normal involvement in the community. Among other things, Anthony suffers from periodic episodes of violence, property destruction, and intense mood disturbances.

78. For many years, Anthony struggled with suicidal ideations, and he attempted suicide no less than ten times, often landing in prolonged hospitalizations and institutionalization. Anthony has been institutionalized at a State Hospital at least two times.

79. Anthony has struggled with a pattern of incarceration for offenses stemming from his episodes of intense mood disturbances.

80. In his twenties and thirties, Anthony suffered from a pattern of hospitalization, institutionalization, and incarceration. While Anthony was often discharged from treatment and placed into traditional outpatient services, he never felt like those traditional treatment programs or services helped him manage his diseases. Anthony struggled to maintain and to manage traditional treatment plans and traditional medication protocols.

81.    Anthony previously lived with his parents, but the emotional strain on them eventually became too much.  They asked him to move out.

82.    Sometime around December 2024, when Anthony was at one of his lowest points in his mental health, he was introduced to the Assertive Community Treatment program.  Anthony started receiving ACT services through a provider enrolled under the Idaho Behavioral Health Plan.  He now has an integrated team of counselors, employment specialists, substance abuse specialists, peer support individuals, and medical providers under the ACT program.

83.    While receiving ACT services, Anthony's violent episodes, intense periods of mood disturbances, and suicidal ideations have improved.  He is healthier.

84.    Through ACT, Anthony has near immediate access to a crisis team that responds whenever he may have a bad day, or whenever he may be on the brink of a violent or disruptive episode.  Anthony routinely relies on immediate ACT services whenever he experiences a mental health crisis.

85.    The ACT team has worked with Anthony to help him manage his medications, and to develop appropriate coping skills and methods to deal with his disease.  Anthony avoids institutionalization by continuing ACT services.

86.    This past year with ACT has been great for Anthony.  He believes that ACT services have helped him manage his disease and that ACT has kept him from having violent or disruptive episodes.

87.    Since receiving ACT services, Anthony has not been re-hospitalized or re-institutionalized, and he credits ACT services for that.

88.    Since receiving ACT services, Anthony has been able to reengage with his parents in a meaningful and healthy relationship.  Anthony credits ACT services in giving his parents a small sense of relief, as they have been worrying less about his mental health, which has been very important for their own well-being.

89.    Since receiving ACT services, Anthony has been able to move into a supported housing situation where he can maintain his independence.  This housing situation is critical to Anthony's continued path of well-being.

90.    Anthony credits the ACT program in keeping him out of jail, out of the hospital, and out of a state-run institution.

91.    Without ACT services, Anthony will lose access to an immediate crisis team and that he will be at an increased risk of experiencing violent and disruptive episodes that likely will lead to his incarceration, hospitalization, or institutionalization.

92.    Without ACT services, Anthony will lose the comprehensive care plan that he has come to rely upon in managing his diseases.

93.    Anthony believes that he can continue to manage his disease working with the ACT team to better improve his coping skills and medication management. Anthony firmly believes that, with ACT, he will be able to stay out of an institution.

94.    Plaintiff **WENDY** is forty-five years old, and she lives in Idaho.

95.    Wendy has been diagnosed with mental health illnesses that significantly impair her day-to-day functioning at home and in the community.

96.    When she was a teenager, Wendy was diagnosed with bipolar type 1 and borderline personality disorder.  Throughout her life, Wendy has struggled with self-harm.

97.    The symptoms of her diseases make it very difficult for Wendy to maintain healthy relationships and to have an active, normal involvement in the community.  Among other things, she suffers from manic episodes.

98.    Throughout the last two decades, Wendy has suffered from a pattern of hospitalizations and institutionalizations.  Wendy has been hospitalized dozens of times.  Wendy has been admitted to a State Hospital no less than four times.

99.    After being hospitalized or institutionalized in the past, Wendy eventually would be discharged into traditional outpatient services, but she almost immediately would relapse and find herself self-medicating with illicit drugs.

100.   Her diseases have had a significant impact on her relationships with friends and with her family.  Prior to last year, Wendy essentially had severed all ties to her family.

101.   In or around November or December 2024, Wendy was introduced to the Assertive Community Treatment program through a provider enrolled in the Idaho Behavioral Health Plan.  Wendy started receiving ACT services from an integrated team of counselors, employment specialists, substance abuse specialists, peer support individuals, and medical providers.

102.   Since receiving ACT services, Wendy's manic episodes and substance abuse issues have improved.

103.   Through ACT, Wendy has near immediate access to a crisis team that responds whenever she is having a bad day or whenever she is on the brink of a manic episode or relapse.  Wendy routinely relies on the ACT team to help her in a mental health crisis.

104.   The ACT team has worked with Wendy to help her manage medications, and the team has helped Wendy develop coping skills and methods to deal with her disease when other traditional treatment methods have failed.

105.   This past year on ACT has been great for Wendy.  She believes that ACT services have helped her manage her disease and have kept her from having frequent manic episodes.

106.   Since receiving ACT services, Wendy has not been re-hospitalized or re-institutionalized, and she credits ACT services for that.

107.   Since receiving ACT services, Wendy has been able to re-engage with her parents in an effort to start rebuilding a healthy relationship.

108.   Since receiving ACT services, Wendy also has been able to move into an apartment where she maintains her independence.  This housing situation is critical to Wendy's continued path toward improved well-being.

109.   While receiving ACT services, Wendy has returned to college, and she currently is working on her degree in social work.

110.   Wendy believes that ACT has been critical in keeping her out of the hospital and out of an institution.  ACT services have been a life-saver for Wendy.

111.   Currently, Wendy is the healthiest that she has been in a very long time, and she credits the ACT services that she has been receiving.

112.   Wendy was recently informed that funding for ACT services will be cut. This would be devasting to her and her ability to effectively manage her disease.

113.   Without ACT services, Wendy will lose access to an immediate crisis team and that she inevitably will be at an increased risk of having disruptive episodes that likely will lead to her incarceration, hospitalization, and institutionalization.

114.   Without ACT services, Wendy will lose the comprehensive care plan that she has come to rely upon in managing her diseases.

115.   Wendy believes that she can continue to manage her disease by working with the ACT team to better improve her coping skills and medication management.

116.   With continued ACT services, Wendy will be able to stay out of an institution.

### Individual government-official defendants

117.   Defendant **JULIET CHARRON**—sued in her official capacity—serves as the Director of the Idaho Department of Health and Welfare.  Ms. Charron leads the Department, supported by four deputy directors, eight division administrators, and three director's office chiefs.  The Idaho Department of Health and Welfare is the

state agency responsible for administering the behavioral healthcare system in Idaho, which provides behavioral health treatment and services to Idaho residents.

118.  Defendant **SASHA O'CONNELL**—sued in her official capacity—serves as a Deputy Director at the Idaho Department of Health and Welfare.  Ms. O'Connell leads the Division of Medicaid within the Department of Health and Welfare.

119.  Defendant **ROSS EDMUNDS**—sued in his official capacity—serves as the administrator for the Division of Behavioral Health within the Idaho Department of Health and Welfare.  Mr. Edmunds oversees the outpatient mental health and substance use disorders treatment system in Idaho, as well as the operations of the three state psychiatric hospitals.

## Legal background

120.  **Medicaid**.  Authorized under Title XIX of the Social Security Act, Medicaid is an entitlement program financed by the federal and state governments and administered individually by each state.  *See* 42 U.S.C. § 1396-1.

121.  Put simply, "Medicaid is a cooperative federal-state program that provides medical care to needy individuals."  *Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606, 610 (2012).  "Medicaid offers the States a bargain: Congress provides federal funds in exchange for the States' agreement to spend them in accordance with congressionally imposed conditions."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 323 (2015).

122.  Medicaid's primary purpose is to enable States to provide medical assistance, rehabilitation, and other services to help low-income families and individuals attain or retain capability for independence of self-care.  *See* 42 U.S.C. § 1396-1.

123.  Participation by States in the Medicaid program is voluntary.  All States—including Idaho—have opted to participate in the program.

124. States are reimbursed by the federal government for a significant portion of the cost of providing Medicaid benefits to eligible patients.

125. States must comply with all requirements of the federal Medicaid Act and its implementing regulations and mandatory guidelines.

126. States must submit a Medicaid plan to the Secretary of the United States Department of Health and Human Services for approval. The State plan describes the administration of the Medicaid program and identifies the services that the State will provide to eligible beneficiaries. 42 U.S.C. § 1396a(a).

127. States must designate a single state agency to administer or to supervise the administration of the Medicaid program and to ensure that the program complies with all relevant laws and regulations. *See* 42 C.F.R. § 431.10(e).

128. The state agency "may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." *Id.*; *see also* 42 U.S.C. § 1396a(a)(5).

129. States may contract with care management organizations to administer the delivery of Medicaid services and to arrange services through provider networks. Even so, the single State Medicaid agency remains responsible for ensuring compliance with all relevant Medicaid requirements, including the mandates of the Medicaid program. *See* 42 U.S.C. §§ 1396a(a)(5), 1396u-2.

130. Each State must ensure that its managed care organizations offer the full range of necessary and appropriate preventive and primary services for all enrolled beneficiaries. *See id.* § 1396u-2(b)(5). That includes maintaining "a sufficient number, mix, and geographic distribution of providers of services." *Id.* § 1396u-2(b)(5)(B).

131. The Medicaid Act requires States to make "medical assistance available" to Medicaid beneficiaries when medically necessary, with "reasonable promptness to all eligible individuals." *Id.* § 1396a(a)(8); *see also id.* § 1396a(a)(10)(A).

132.   The State of Idaho adopted a Medicaid plan that the federal government approved, and the state plan is administered by the Idaho Department of Health and Welfare.

133.   The Idaho Department of Health and Welfare "shall be the single state agency for administration of public assistance programs or plans that receive federal funding."  Idaho Code § 56-210(3).

134.   The director of the Department shall administer "public assistance and social services to eligible people."  Idaho Code § 56-202(a).

135.   **Americans with Disabilities Act**.  Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).

136.   In enacting the ADA, Congress recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Id.* § 12101(a)(2).

137.   Discrimination "against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, *institutionalization*, *health services*, voting, and *access to public services*." *Id.* § 12101(a)(3) (emphasis added).

138.   Among the forms of discrimination recognized by Congress and prohibited under the ADA is the unnecessary "segregation" of persons with disabilities and their "relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." *Id.* § 12101(a)(5).

139.   The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

140. The Supreme Court has held that the ADA prohibits the unjustified segregation of individuals with mental health disabilities. *See Olmstead*, 527 U.S. at 600. The Court explained that its holding "reflects two evident judgments." *Id.*

141. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

142. "Dissimilar treatment correspondingly exists in this key respect: In order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice." *Id.*

143. "The critical issue is whether the services are necessary to maintain Plaintiffs' mental or physical health, and to avoid serious risk of institutionalization." *M.R. v. Dreyfus*, 663 F.3d 1100, 1115 (9th Cir. 2011), *opinion amended and superseded on denial of reh'g*, 697 F.3d 706 (9th Cir. 2012).

144. **Rehabilitation Act**. Similar to the ADA, the Rehabilitation Act prohibits discrimination on the basis of a disability, *see* 29 U.S.C. § 794(a) and 28 C.F.R. § 41.51(a), requires the provision of services in the most integrated setting, *see* 28 C.F.R. § 41.51(d), and makes it a violation of the Act to use methods of administration that subject individuals to discrimination, *see* 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

145. "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

146.  Under the Rehabilitation Act, a "program or activity" means "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government."  *Id.* § 794(b)(1).

147.  And a disability includes a physical or mental impairment, such as "any physiological disorder or condition," or any "mental or psychological disorder such as intellectual disability, organic brain syndrome, mental health condition, and specific learning disability."  45 C.F.R. § 84.4(b)(1)(i)-(ii).

148.  Programs or activities that receive federal funding may not deny or otherwise afford a qualified individual with a disability the "opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others."  28 C.F.R. § 41.51(b)(1)(ii).

149.  In addition, such programs or activities must afford a qualified individual with a disability the "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  *Id.* § 41.51(b)(1)(iii).

150.  For nearly all relevant purposes, courts construe the ADA and the Rehabilitation Act co-extensively because "there is no significant difference in the analysis of rights and obligations created by the two Acts."  *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1098 (9th Cir. 2013) (internal quotation marks omitted).

## **Factual allegations**

151.  The Idaho Department of Health and Welfare supervises the Idaho Behavioral Health Plan, which offers behavioral health services to Medicaid patients in Idaho.

152. Historically, the Department has not administered the plan. The Department instead has contracted private companies to administer the Idaho Behavioral Health Plan.

153. The Department previously contracted Optum Health to administer the Idaho Behavioral Health Plan. In July 2024, the Department announced that it had transitioned the contract to Magellan Healthcare. *See, e.g.*, Press Release, *New Idaho Behavioral Health Plan launches today* (July 1, 2024).[3]

154. Magellan contracts with health care providers across Idaho and then reimburses the providers for Medicaid services to eligible patients.

155. The Idaho Behavioral Health Plan requires Magellan to provide Assertive Community Treatment services to eligible patients. Indeed, Magellan has a contractual obligation to do so.

156. The State of Idaho specifically required Magellan to provide ACT services to eligible Medicaid patients under the plain terms of its contract.

157. **Assertive Community Treatment**. In its Medicaid Plan and amendments, the State of Idaho specifies that Assertive Community Treatment services will be provided to eligible Medicaid patients. *See* Letter from U.S. Dep't of Health & Human Services, Centers for Medicare & Medicaid Services, to Deputy Director Juliet Charron, Idaho Dep't of Health and Welfare (Aug. 29, 2024), at 1.[4]

158. The State of Idaho provides Assertive Community Treatment as a rehabilitative service under 42 C.F.R. § 440.130.

159. Rehabilitative services include "any medical or remedial services recommended by a physician or other licensed practitioner of the healing arts, within the scope of his practice under State law, for maximum reduction of physical or

[3] Available at https://healthandwelfare.idaho.gov/news/new-idaho-behavioral-health-plan-launches-today.

[4] Available at https://www.medicaid.gov/medicaid/spa/downloads/ID-24-0003.pdf.

mental disability and restoration of a beneficiary to his best possible functional level." 42 C.F.R. § 440.130(d).

160.  As explained in the plan submitted to CMS for approval (PDF page 38 of 86), Assertive Community Treatment refers to an evidence-based practice necessary to bring care to those with severe mental illness, including individuals who do or would pose a threat to themselves or others.

161. Individual patients receive ACT services in Idaho from mobile, multidisciplinary teams of providers in community settings.  ACT services are available to individual patients twenty-four hours per day.

162.  Individual patients receiving ACT services will have at least one contact with their assigned treatment team every forty-eight hours.

163.  ACT services are provided based on the assessment of an individual patient's mental, physical, and behavioral condition and history, which will be the basis for establishing the individual patient's functional deficits and recovery goals.

164.  Treatment teams must document all medically necessary ACT services provided to each individual patient in a person-centered service plan.  Any legal or criminal justice needs must be clearly identified in the goals and objectives for each individual patient, and each person-centered service plan must be reviewed (and revised as appropriate) every ninety calendar days.

165.  Specific, measurable, achievable ACT recovery outcomes can include:

- Reduced hospitalizations, re-hospitalization, or use of emergency rooms;
- Reduced arrests;
- Reduced days of incarceration;
- Reduced use of crisis services;
- Increased housing stability;
- Increased interactions with natural supports;

- Increased engagement with employment or education; and

- Improved quality of life.

166. Treatment teams routinely will have collateral contacts with each individual patient's family, and others significant in their life, because these contacts provide a direct benefit to the individual patient and are conducted in accordance with and for the purpose of advancing the person-centered service plan and for coordination of services with other community and medical providers.

167. Medically necessary ACT services include individual assessments as well as rehabilitative services focused on increasing an individual patient's engagement with treatment and recovery. Treatment is a dynamic and cooperative process that includes active listening, psychotherapeutic approaches, shared decision-making, and outreach strategies.

168. Treatment teams engage and assist individual patients in the restoration of social, interpersonal, and basic living skills impacted by, or lost as a result of, mental illnesses that hinder the individual patient's ability to live in an integrated community setting.

169. Treatment is an active process that includes the coordination of services and support efforts, assistance in transitioning from a hospital setting, and the ongoing identification or modification of support efforts—all designed to promote community tenure and to manage the behavioral and physical health needs for each individual patient.

170. In Idaho, ACT services are provided by licensed professional staff, and by unlicensed staff under the supervision of licensed staff.

171. Professional staff supervision for unlicensed staff occurs both formally (i.e., through direct supervision and clinical consultation) as well as informally (i.e.., through regular organizational and service planning meetings), which are a hallmark of the ACT evidence-based practice model.

172. As explained on the Department's website: "ACT teams strive to function as a psychiatric hospital without walls, helping people maintain recovery in the community and reduce psychiatric hospital and jail stays."[5]

173. **History and effectiveness of ACT services**. A group of doctors first developed the ACT treatment program more than fifty years ago after noticing that many patients, especially those with the most serious mental health conditions, would be hospitalized many times for the same issue. "The doctors believed they could develop a new type of mental health service model that would give more patients the ability to stay well while still living in the community." Elizabeth Mohn, *Assertive Community Treatment*, EBSCO (2023).[6]   In essence, the ACT model helps patients who have not responded well to traditional mental health treatment methods

174. Under the traditional "case management model" for treatment, patients with mental illnesses "visit various medical professionals for each symptom or condition that needs treating." *Id.* "Often, however, the care individuals receive in this model is not integrated, meaning providers do not work together to understand all the different medical interventions a person is receiving." *Id.* "Although some patients benefit from the case management model, psychiatrists have found that some patients, especially those with the *most serious conditions*, benefit more from *integrated care* provided by various professionals with different backgrounds and specialties." *Id.* (emphasis added).

175. The ACT model provides integrated care. Rather than brokering various services and forcing patients with the most serious mental illnesses to visit a

---

[5] Available at:  https://healthandwelfare.idaho.gov/providers/center-excellence/assertive-community-treatment-act-competency-center.

[6] Available at:  https://www.ebsco.com/research-starters/consumer-health/assertive-community-treatment-act

bunch of different medical professionals to treat each symptom or condition, the ACT model relies on a team of service providers working cooperatively to treat individual patients.  The ACT team itself is the service delivery vehicle.

176. **Termination of ACT services**.  As explained above, the Idaho Behavioral Health Plan allows for individual patients with severe mental illnesses to receive ACT services.  The Idaho Behavioral Health Plan specifically refers to Assertive Community Treatment as a service offered to patients who "have not benefitted from traditional outpatient services."

177. Mental health care providers use a specific Medicaid billing code—i.e., H0040—when providing ACT services to individual patients with severe mental illnesses.  The providers are reimbursed for ACT services based on the daily rate associated with the code (H0040).

178. The State of Idaho contracted Magellan to administer the Idaho Behavioral Health Plan.

179. On October 31, 2025, Magellan sent notice to network service providers informing them that it no longer would reimburse mental health providers for Assertive Community Treatment services provided to individual patients under the applicable billing code (H0040) after December 1, 2025:

# Provider Notice

## Overview

Effective Dec. 1, 2025, the daily rate for Assertive Community Treatment (ACT) will no longer be billable. Individual behavioral health ACT services will be reimbursed based on Magellan Healthcare's Idaho Behavioral Health Plan (IBHP) fee schedule.

**The following code will no longer be billable through Magellan for dates of service on or after Dec. 1, 2025.**

- **ACT:** H0040 Q2

With the transition of the Idaho Department of Health and Welfare's Center of Excellence (CoE), providers delivering ACT services will follow IBHP individual service delivery requirements. For more information on continued CoE support, contact IDACTCoE@dhw.idaho.gov. Please also refer to the email notification from Monica Martin, Program Manager with the ACT CoE, from October 28, 2025, which explains what support the ACT CoE is able to provide during their transition.

180. Individual patients eventually were informed that ACT services no longer would be provided to them after December 1, 2025.

181. Representatives from Magellan directly called individual patients the day before Thanksgiving to inform the patients that they no longer would receive ACT services starting Monday, December 1, 2025.

182. The Idaho Department of Health of Welfare did not provide public notice of any change to the existing state plan (which currently *requires* ACT services), and the Department neither sought nor obtained approval from the federal Centers for Medicare and Medicaid Services to make any such changes to the ACT services that the federal government previously approved under the state plan.

183. On November 26, 2025, however, Defendant Charron, Director of the Idaho Department of Health and Welfare, sent a letter addressed to *tribal representatives* announcing that she intended to submit plan amendments to CMS to remove certain benefits from the approved state Medicaid plan. Among the list of services proposed for removal, the letter states: **"Discontinue Assertive**

**Community Treatment (ACT) as a unique bundled service**."  Exhibit A (attached here) (original emphasis).  The second page of the letter states that  the Department intends to submit these amendments to CMS with an effective date of today—i.e., December 1. 2025.  *Id.* at 2.

184.  As explained above (¶ 155), Magellan's contract requires it to provide ACT services to patients with severe mental illnesses under the Idaho Behavioral Health Plan.  Magellan has no authority to decide on its own whether to stop providing ACT services to patients or whether to stop reimbursing providers for the ACT services that Magellan must offer to individual patients in accord with its contract.

185.  Only the Idaho Department of Health and Welfare has the authority to direct Magellan.  The Department—*not* Magellan—is "the single state agency for administration of public assistance programs or plans that receive federal funding." Idaho Code § 56-210(3).

186.  The individual government-official defendants are responsible for administering Idaho Behavioral Health Plan, and they are responsible for supervising Magellan.

187.  The individual government-official defendants are responsible for the termination of ACT services under the Idaho Behavioral Health Plan because they serve in leadership positions at the Idaho Department of Health and Welfare—the single state agency in charge of all Medicaid services in Idaho.

188.  The individual government-official defendants have ultimate responsibility for administering the Medicaid program in Idaho in accordance with applicable law.  *See* 42 C.F.R. § 431.10(b), (e).

189.  The individual government-official defendants cannot transition the existing ACT program to one that reimburses providers based on a fee-for-service model that somehow could capture "individual" ACT services provided to mental

health patients suffering serious illnesses. The traditional approach to treatment is inconsistent with applicable law, and it is inconsistent with the entire purpose of ACT services, which are specifically designed to be *bundled* for patients in need of comprehensive care.

190. **Devasting impacts**. Defendants' failure to provide timely, statewide access to ACT services after December 1, 2025, will have cascading negative consequences for plaintiffs and for their families, including increasing acuity of mental health symptoms, more frequent and intense mental health crises, and an overall functional decline in their day-to-day lives negatively impacting not only family and social connections but also their own well-being and personal safety as well as the safety of others and the public at large.

191. As demonstrated by the experiences of the individual plaintiffs, the defendants' failure to provide bundled ACT services—as required by the Idaho Behavioral Health Plans and approved by CMS—makes it extremely likely that the plaintiffs (and class members) will experience deterioration in their mental health conditions and that they will face repeated, prolonged, and unnecessary institutionalization, avoidable out-of-home placement and otherwise avoidable personal and public harm.

192. Institutionalized patients often experience a worsening of their individual symptoms and behaviors for which they were originally admitted, and if that segregation from society persists, a loss of skills associated with living in the community. All this can—and should—be avoided.

193. The ACT program currently is authorized under applicable law, and it continues to work exactly as it was designed to operate. Hundreds of patients with severe mental illnesses need comprehensive care to avoid institutionalization and prolonged hospitalization.

194. Cutting critical services for patients with severe mental illnesses is illegal and irresponsible. Plaintiffs have fought hard to remain in the community and to work closely with treatment teams offering ACT services to them. Plaintiffs have benefited tremendously from the ACT services that they thus far have received and that they lawfully seek to continue receiving those services after December 1, 2025.

## Class Action Allegations

195. Pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure, the individual plaintiffs bring this class action on behalf of themselves and on behalf of the following class: all Medicaid-eligible patients residing in the State of Idaho with serious mental illnesses for whom Assertive Community Treatment services have been recommended, provided, and reimbursed from July 1, 2024, to the date of the filing of this complaint.

196. Defendants' administrative policies and practices, as well as the manner in which they operate and oversee the Medicaid-funded mental health system in Idaho (administered by Magellan since July 1, 2024), harms plaintiffs and class members by depriving them of Assertive Community Treatment services required by law. Defendants have failed to provide and/or to arrange for meaningful access to mental health and other services to correct or to ameliorate plaintiffs' mental health conditions. ACT services allow plaintiffs to avoid unnecessary segregation from society and extended institutionalization.

197. The class is numerous and geographically diverse, such that joinder of all members is impracticable here.

198. Without data collection and public reporting, precise figures for the exact number of Medicaid-eligible patients residing in Idaho and qualified to receive Assertive Community Treatment services under the Idaho Behavioral Health Plan are presently not available. It was recently reported, however, that "[a]bout 400 to

500 people across the state are on the program." Kyle Pfannenstiel, *Idaho Medicaid contractor to cut critical services for people with severe mental illness*, IDAHO CAPITAL SUN (Nov. 21, 2025).

199. Members of the class would face difficulty pursuing their own individual legal claims because of limited financial resources and because of the demands associated with their care. Even if such individual claims could be brought, they would be unable to remedy underlying systematic violations of federal law without the benefit of class treatment.

200. Defendants' systemic failures, which arise from the implementation of their own internal policies and procedures, give rise to a number of common factual questions including, but not limited to:

- Whether the defendants systematically failed to assess class members' ongoing need for Assertive Community Treatment services;

- Whether the defendants collectively or individually authorized or directed Magellan to make changes to the reimbursement policies for Assertive Community Treatment services under the Idaho Behavioral Health Plan;

- Whether the defendants failed to provide for the continuation of Assertive Community Treatment services to plaintiffs and to eligible class-member patients;

- Whether the defendants failed to implement administrative policies and procedures necessary to ensure that class members receive mental health services in community-based settings to avoid unnecessary hospitalization or prolonged institutionalization;

- Whether the defendants' administrative policies, procedures, and practices (or the absence thereof) systematically deprived class members of Assertive Community Treatment services that they need to continue to ameliorate and to address their mental health illnesses;

- Whether the defendants' failure to ensure adequate treatment planning contributes to class members' threat of prolonged and repeated institutionalization; and

- Whether the defendants' procedures for monitoring and supervising Idaho's mental health system failed to ensure that class members receive medically necessary care and treatment.

201. Class members' allegations also raise common questions of law that make the requested declaratory and injunctive relief applicable to the class as a whole, including, but not limited to:

- Whether the defendants systematically have deprived class members of Assertive Community Treatment services in violation of the federally approved  Idaho Behavioral Health Plan;

- Whether the defendants administer and supervise Idaho's mental health system in a way that subjects class members to disability discrimination in violation of the Americans with Disabilities Act and in violation of the Rehabilitation Act;

- Whether the defendants are violating the Americans with Disabilities Act and the Rehabilitation Act by failing to treat class members in a setting appropriate for their mental health needs; and

- Whether an injunction should be issued to require the defendants to comply with federal law in administrating the Idaho Behavioral Health Plan and the requirement to provide Assertive Community Treatment services.

202. The claims of the individual plaintiffs are typical of the claims of the proposed class.  The individual plaintiffs possess the same interest as members of the class, suffer the same injury, and raise legal claims arising out of the same course of conduct by the defendants.

203.  The individual plaintiffs will fully and vigorously prosecute this action, and they adequately and fairly represent the interests of the class.  They seek declaratory and injunctive relief that will inure to the benefit of the class as a whole.

204.  The individual plaintiffs are represented by attorneys experienced in federal class action litigation and disability law, including relevant litigation experience with the federal Medicaid program.

205.  Class certification under Rule 23(b)(2) is appropriate because the defendants have acted or refused to act in ways that are applicable to the class as a whole.

206.  The alleged systematic deficiencies are reflected in the administrative, operational, and funding decisions described in this complaint.  The deficiencies embody a common course of conduct toward the class, and they result in a common injury to class members. That injury can be remedied through a single injunctive order issued by this Court requiring the defendants to:  (1) provide and arrange for Medicaid-eligible patients to continue to receive Assertive Community Treatment services consistent with the Idaho Behavioral Health Plan approved by the federal government; (2) continue to deliver Assertive Community Treatment services to mental health patients to avoid unnecessary hospitalization or prolonged institutionalization; and (3) ensure that patients have access to an adequate statewide network of providers offering Assertive Community Treatment services to eligible Medicaid patients; and (4) deliver Assertive Community Treatment services as required by law.

## Causes of Action

### Count I:  Violation of the Americans with Disabilities Act
### (Against all defendants)

207.  Plaintiffs incorporate by reference the above paragraphs (¶¶ 1–206) as though set forth here.

208.  To establish that a public service or program violates Title II of the ADA, a plaintiff must show "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against by the public entity; (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).

209.  The individual plaintiffs are "qualified individuals with a disability" who are protected under Title II of the ADA.  42 U.S.C. §§ 12102, 12131(2).

210.  Defendants, sued in their official capacities, are "public entities" within the meaning of Title II of the ADA.

211.  Directly or through contractual or other arrangements, defendants have supervised administration of the Idaho Behavioral Health Plan, and they have utilized criteria or methods of administration that have subjected plaintiffs to discrimination on the basis of their mental illness disabilities.   28 C.F.R. § 35.130(b)(3).

212.  Plaintiffs have been denied continued access to Assertive Community Treatment services authorized under the Idaho Behavioral Health Plan, and the denial of ACT services was by reason of their mental health illnesses.  The failure to provide Medicaid services to mental health patients in a community-based setting is a form of discrimination on the basis of disability.  *See Olmstead*, 527 U.S. at 600–01.

213.  Where plaintiffs allege that the individuals who administer state Medicaid agencies have failed to provide requisite services in accord with federal law, thereby harming the plaintiffs, those allegations meet the traceability requirement. *See, e.g.*, *M.G. v. N.Y. State Off. of Mental Health*, 572 F. Supp. 3d 1, 12–13 (S.D.N.Y. 2021) (finding traceability requirement satisfied where a class of formerly incarcerated individuals with mental disabilities alleged that defendants failed to

adequately administer, oversee, and fund the state's mental health systems, thereby resulting in their unnecessary institutionalization).

214. Unlawful discrimination occurred here because the individual defendants have "violated the ADA's 'integration mandate' regulations." *Siino v. City of New York*, No. 14-CV-7217, 2020 WL 3807451, at *12 (E.D.N.Y. Feb. 27, 2020) (quoting *Frank v. Sachem Sch. Dist.*, 84 F. Supp. 3d 172, 185 (E.D.N.Y. 2015)).

215. "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The most integrated setting appropriate is the "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Olmstead*, 527 U.S. at 592 (internal quotation marks omitted).

216. Plaintiffs may allege a valid claim for disability discrimination under the ADA by demonstrating that the defendants' actions pose a serious risk of institutionalization for disabled persons.

217. Plaintiffs need only show that the challenged state action creates a "*serious risk* of institutionalization." *Oster v. Lightbourne*, No. C 09-4668 CW, 2012 WL 691833, at *16 (N.D. Cal. Mar. 2, 2012) (citing *M.R. v. Dreyfus*, 663 F.3d at 1116) (emphasis added). And it certainly does here: plaintiffs have explained in detail above how they face a serious risk of institutionalization without ACT services.

218. The U.S. Department of Justice has confirmed that the "elimination of services that have enabled Plaintiffs to remain in the community violates the ADA, regardless of whether it causes them to enter an institution immediately, or whether it causes them to decline in health over time and eventually enter an institution in order to seek necessary care." *M.R. v. Dreyfus*, 663 F.3d at 117 (quoting DOJ's statement of interest).

219.  "Unsurprisingly, against this backdrop," courts across the country have applied the disability discrimination claim recognized in *Olmstead* consistently to hold "that the risk of institutionalization can support a valid claim under the integration mandate." *Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016) (collecting cases).

220.  Plaintiffs are entitled to declaratory and injunctive relief to remedy the defendants' violations of Title II of the Americans with Disabilities Act.

221.  The relief sought by the plaintiffs will not require a fundamental alteration of the programs, services, or activities supervised by the defendants. Indeed, defendants already are required by federal law to provide Assertive Community Treatment services to eligible Medicaid patients under the Idaho Behavioral Health Plan, and compliance with the ADA will not impose unreasonable costs on the defendants' existing mental health service system.

### Count II:  Violation of the Rehabilitation Act
### (Against all defendants)

222.  Plaintiffs incorporate by reference the above paragraphs (¶¶ 1–206) as though set forth here.

223.  Similar to the ADA, the Rehabilitation Act prohibits discrimination on the basis of a disability, *see* 29 U.S.C. § 794(a) and 28 C.F.R. § 41.51(a), requires the provision of services in the most integrated setting, *see* 28 C.F.R. § 41.51(d), and makes it a violation of the Act to use methods of administration that subject individuals to discrimination, *see* 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

224.  The Rehabilitation Act states that no "otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

225.  A "program or activity" under the Rehabilitation Act includes *all* of the operations of "a department, agency, special purpose district, or other instrumentality of a State or of a local government," *id.* § 794(b)(1)(A), or "the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government," *id.* § 794(b)(1)(B).  That statutory definition encompasses all relevant actions taken by the individual defendants in the operation and supervision of the Idaho Department of Health and Welfare as the single state agency responsible for administration of the state Medicaid plan and the Idaho Behavioral Health Plan.

226.  Each named plaintiff has a disability, which includes a physical or mental impairment, such as "any physiological disorder or condition," or any "mental or psychological disorder such as intellectual disability, organic brain syndrome, mental health condition, and specific learning disability."  45 C.F.R. § 84.4(b)(1)(i)-(ii).  The same is true for all proposed class members who receive ACT services.

227.  The defendants receive funding to administer the state Medicaid plan and the Idaho Behavioral Health Plan.  Programs or activities that receive federal funding may not deny or otherwise afford a qualified individual with a disability the "opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others."  28 C.F.R. § 41.51(b)(1)(ii).

228.  In addition, such programs or activities must afford a qualified individual with a disability the "equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  *Id.* § 41.51(b)(1)(iii).

229.  The defendants also must "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." *Id.* § 41.51(d)

230. This Court construes the ADA and the Rehabilitation Act co-extensively because "there is no significant difference in the analysis of rights and obligations created by the two Acts." *K.M. ex rel. Bright*, 725 F.3d at 1098 (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002)).

231. The judgment of Idaho's public health professionals has been rendered on the question as to what treatment services are appropriate for hundreds of patients with severe mental illnesses:  the Idaho Behavioral Health Plans currently allows for Assertive Community Treatment services in the most integrated setting appropriate for plaintiffs' needs.  ACT services are provided to plaintiffs and all similarly situated individuals in the *local community* where they live.

232. In July 2024, the State of Idaho submitted proposed amendments to the Centers for Medicare & Medicaid Services to add Assertive Community Treatment services to the existing state Medicaid plan.  CMS reviewed and approved that amendment.  The State of Idaho has not made any changes to state plan since then to address ACT services, and CMS has not reviewed or approved any other relevant changes to ACT services.

233. The State of Idaho has required Magellan to provide ACT services to patients with severe mental illnesses under the plain terms of its contract.

234. The State of Idaho has not changed its contract with Magellan with regard to ACT services required under the Idaho Behavioral Health Plan.

235. The individual defendants, sued in their official capacity, are recipients of federal funds under the Rehabilitation Act.

236. Plaintiffs are qualified individuals with disabilities under the Rehabilitation Act.  *See* 29 U.S.C. § 705(20).

237. Defendants' actions constitute unlawful discrimination under 29 U.S.C. § 794(a), and they violate the integration mandate, 28 C.F.R. § 41.51(d), because the defendants have failed to administer programs and activities authorized under the

Idaho Behavioral Health Program—i.e., the provision of ACT services—in the most integrated setting appropriate to plaintiffs' needs (i.e., where they live).

238.   Defendants unlawfully have deprived plaintiffs of receiving ACT services after December 1, 2025.

239.   Defendants' actions create a "serious risk of institutionalization" for the plaintiffs.  *Oster*, 2012 WL 691833, at *16.  Plaintiffs have explained in detail above how they face a serious risk of institutionalization without ACT services.  *See* 28 C.F.R. § 41.51(d).

240.   Plaintiffs require ACT services to avoid unnecessary segregation. Defendants' failure to arrange for the continued provision of ACT services as a requirement of the Idaho Behavioral Health Plan violates the Rehabilitation Act and its implementing regulations.

241.   Plaintiffs are entitled to declaratory and injunctive relief to remedy these violations.

242.   The relief sought by the plaintiffs will not require a fundamental alteration of the programs, services, or activities supervised by the defendants. Indeed, defendants already are required by federal law to provide Assertive Community Treatment services to eligible Medicaid patients under the Idaho Behavioral Health Plan, and compliance with the Rehabilitation Act will not impose unreasonable costs on the defendants' existing mental health service system.

## **Prayer for Relief**

WHEREFORE, plaintiffs respectfully pray for the following relief and remedies on behalf of themselves and others similarly situated:

(a)     Certify the class defined above in Paragraph 194;

(b)     Issue a declaratory judgment that Defendants Charron, O'Connell, and Edmunds have violated the Americans with Disabilities Act and the Rehabilitation Act with respect to their failure to provide Assertive Community Treatment services

to eligible Medicaid patients seeking to treat serious mental illnesses under the Idaho Behavioral Health Plan;

(c)    Issue a declaratory judgment that Defendants Charron, O'Connell, and Edmunds have violated the Americans with Disabilities Act and the Rehabilitation Act with respect to their failure to provide Assertive Community Treatment services to plaintiffs in integrated settings after December 1, 2025;

(d)    Issue preliminary and permanent injunctive relief enjoining Defendants Charron, O'Connell, and Edmunds from subjecting plaintiffs to practices that violate their rights under the Americans with Disabilities Act and the Rehabilitation Act;

(e)    Issue preliminary and permanent injunctive relief requiring Defendants Charron, O'Connell, and Edmunds to arrange for the continued provision of Assertive Community Treatment services to plaintiffs in accord with the Idaho Behavioral Health Plan; to arrange for any assessments of plaintiffs and class members who have experienced repeated admissions to mental health institutions and hospitals to determine whether Assertive Community Treatment services are necessary to ameliorate their conditions in the community; to establish and implement administrative policies, procedures, and practices required to avoid subjecting plaintiffs to unnecessary segregation or the serious risk of segregation; to ensure sufficient provider network capacity to deliver Assertive Community Treatment services to plaintiffs and class members on a statewide basis; and to provide sufficient information on a quarterly basis to allow the Court and the plaintiffs to monitor compliance with the Court's injunction and with the requirements of federal law.

(f)    Award plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794a; and

(g)    Grant any additional relief as may be just and proper.

Respectfully submitted,

GIVENS PURSLEY LLP


*/s/ Jeffrey S. Beelaert*
Jeffrey S. Beelaert
Preston N. Carter
Don Z. Gray
Megann E. Meier

*Attorneys for Plaintiffs*

December 1, 2025