RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

BRIAN V. CHURCH, ISB #9391
Lead Deputy Attorney General
BENJAMIN SEVER, ISB #12120
Deputy Attorney General
Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
brian.church@ag.idaho.gov
ben.sever@ag.idaho.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RAMON, by and through next friend, G.C.; THOMAS, by and through next friend, C.G.; CAMERON, by and through next friend, B.E; ANTHONY; and WENDY, on behalf of themselves and those similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>JULIET CHARRON, in her official capacity as Director, Idaho Department of Health and Welfare; SASHA O'CONNELL, in her official capacity as Deputy Director, Idaho Department of Health and Welfare; ROSS EDMUNDS, in his official capacity as Administrator, Division of Behavioral Health,<br><br>*Defendants*. | Case No. 1:25-cv-00676-AKB<br><br>**OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [Dkt. 10]** |

**INTRODUCTION**

In August 2025, in light of significant budgetary constraints, Idaho Governor Brad Little mandated a 3% budget cut across most state agencies, including the Idaho Department of Health and Welfare (Department). To meet this mandate, the Defendants, all high-level officials within the Department, with few available options, had to make very difficult decisions. Among other things, the Defendants imposed a 4% rate cut to Medicaid reimbursement rates across the board and, as relevant to this case, changed the reimbursement procedures for Assertive Community Treatment (ACT) services.

ACT, is a blend, or "bundle," of rehabilitative community-based services. The benefit offers treatment, rehabilitation, and support services "using a person-centered, recovery-based approach to individuals who have been diagnosed with severe and persistent mental illness (SPMI)." Dkt. 4-2 at 4. ACT is implemented in the community by a mobile, interdisciplinary team that provides 24-hour outreach and support to individuals. While Defendants believe in the ACT program and its effectiveness, ACT, unlike other services under federal and state law, is not a mandatory service that requires Medicaid reimbursement. It is an optional service that has been covered by Idaho Medicaid for only a year. Defendants therefore chose to "unbundle" ACT services, and instead offer Medicaid reimbursement of component services of ACT—like prescriptions and doctor visits—on an individual basis. This change is made effective December 1, 2025.

The Department did not make the choice lightly. However, the Defendants had limited options. Among these other options are potential cuts to or elimination of other critically important mental health services, including additional cuts to state psychiatric hospitals; elimination of youth and adult mental health crisis centers and mobile crisis units; and substantial cuts to reimbursement rates for residential mental health treatment facilities, which would risk the private facilities no

longer participating in Medicaid. The granting of Plaintiffs' motion in this case would necessitate finding other services to cut, which would result in substantial harm to other members of Idaho's most vulnerable citizens.

Idaho has an obligation to consider all of its citizens, and in doing so, the Defendants made difficult decisions. But the Americans with Disabilities Act ("ADA") and Rehabilitation Act's ("RA") "discrimination" provisions give the Court no authority to second guess these decisions. Plaintiffs' motion should be denied.

## LEGAL STANDARD

Temporary restraining orders and preliminary injunctions are governed by the same standards. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). "Under *Winter*, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009). When the government is a party, the public interest and balance of equities factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Alternatively, courts apply the "sliding scale" approach when there are serious questions going to the merits. *Developmental Services Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011). Under this variation, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). "Demonstrating a likelihood of success on the merits, or serious questions going to the

merits, is the most important element of a preliminary injunction." *Perlot v. Green*, 609 F. Supp. 3d 1106, 1126 (D. Idaho 2022) (internal quotation omitted).

Importantly, however, even under the sliding scale approach, the plaintiffs still must make a clear showing of all four prongs. *All. for the Wild Rockies*, 632 F.3d at 1135; *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012); *Perlot*, 609 F. Supp. 3d at 1116.

### ARGUMENT

### I. Plaintiffs have failed to show a likelihood of success on the merits, and have failed to show serious questions going to the merits

Plaintiffs contend that a preliminary injunction is warranted because the Defendants' decision to "unbundle" ACT services constitutes discrimination by violating the integration mandate required by the ADA and as articulated in *Olmstead*. Dkt. 10-1 at 12. However, Plaintiffs have failed to recognize, or address the fact, that a TRO or PI in this case would force the Defendants to make cuts to other programs affecting members of Idaho's disabled community. As such, Plaintiffs have failed to show a likelihood of success on the merits, or even a serious question going to the merits, because a TRO or PI in this case would result in a fundamental alteration of the Medicaid program and result in cuts to other critically important Medicaid services.

### A. The "unbundling" of ACT does not result in disability discrimination.

The Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") each "prohibit discrimination on the basis of disability in the administration of a public program receiving Federal funding." *Sanchez v. Johnson*, 416 F.3d 1051, 1062 (9th Cir. 2005). These two provisions are construed co-extensively because "there is no significant difference in the analysis of rights and obligations created by the two Acts." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1098 (9th Cir. 2013) (citation omitted).

"To prove that a public program or service violated Title II of the ADA," plaintiffs must prove the following: (1) they are "qualified individual[s] with a disability;" (2) they were "either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and (3) that "such exclusion, denial of benefits, or discrimination was by reason of [their] disability." *Mayfield v. City of Mesa*, 131 F.4th 1100, 1109 (9th Cir. 2025).

The implementing federal regulations require states to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *see also* 28 C.F.R. § 41.51(d). In *Olmstead v. L.C. ex rel. Zimring*, the Supreme Court construed this provision to require that, "under Title II of the ADA, States are required to provide community-based treatment"—as opposed to institutional-based treatment, like treatment provided in a hospital—"for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. 581, 607 (1999).

Still, the Supreme Court has emphasized that these laws do not "impose[] on the States a 'standard of care' for whatever medical services they render" or "require[] States to provide a certain level of benefits to individuals with disabilities." *Olmstead*, 527 U.S. at 603 n.14. The test set forth in *Olmstead* has effect only "where the issue is the *location* of services, not *whether* services will be provided." *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003). Nor does the Medicaid Act require that ACT bundled services be covered at all. *See* §1396a(a)(10)(A) (excluding rehabilitative services under §1396d(a)(13)(C) from the list of mandatory services);

Dkt. 9 ¶ 158 ("The State of Idaho provides Assertive Community Treatment as a rehabilitative service under 42 C.F.R. § 440.130."); *Beal v. Doe*, 432 U.S. 438, 444 (1977) (the Medicaid Act "confers broad discretion on the States to adopt standards for determining the extent of medical assistance").

Here, Plaintiffs are plainly attempting to use the ADA and RA to require the State to provide them with a "certain level of benefits." *Olmstead*, 527 U.S. 581, 603 n.14. The Department has ceased paying for ACT bundled services, and instead will cover only the component parts of ACT that would otherwise be covered, like prescriptions and doctor visits. O'Connell Decl. at ¶ 16; Welsh Decl. at ¶ 11.[1] Plaintiffs may not use the ADA or RA to reverse that policy choice that the law has explicitly left to the Department's discretion. Indeed, if Plaintiffs' theory were correct, ACT would convert from an optional service to cover under Medicaid to one that states *must* cover, meaning Plaintiffs could have brought this suit any time before July 1, 2024 when Idaho decided to cover ACT by Medicaid in the first place. *But see Alexander v. Choate*, 469 U.S. 287, 303 (1985) ("Medicaid programs do not guarantee that each recipient will receive that level of healthcare precisely tailored to his or her particular needs.").

Plaintiffs' argument is primarily based on the Ninth Circuit's extension of *Olmstead* in *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012). There, the Court held—deferring to the federal government's "statement of interest" that would no longer receive deference, *see Kisor v. Wilkie*, 588 U.S. 558, 577–79 (2019)—that *Olmstead* reaches not only to *where* the state provides services (in the community vs. in an institutional setting) but also *how* the state provides services (in a way and amount that does not "creates a serious risk of institutionalization"). *Dreyfus*, 697 F.3d at 734

---

[1] To the extent Plaintiffs suggest ceasing to cover ACT may violate the Medicaid Act, Dkt. 10-1 at 14, they have not raised such a claim, and would have no cause of action to raise such a claim. *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 376 (2025).

(State of Washington could not cover service in insufficient amount). But it did not—and could not, given *Olmstead* and other Ninth Circuit precedent—dictate "*whether* services will be provided by the state." *Townsend*, 328 F.3d at 517. And here, the State has decided not to cover ACT bundled services at all.

Moreover, in their renewed motion for TRO/PI, Plaintiffs ignore the issue of whether the ACT services "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities" *See generally* Dkt. 10-1 at 10–15. Instead, Plaintiffs focus entirely on the status quo and whether ACT services are effective. *Id.* Defendants agree that ACT services are effective, and if there was sufficient funding, Defendants would gladly continue to provide ACT services. However, in light of significant budget challenges, Defendants had to make hard decisions in order to save money.

The Supreme Court is clear that the "State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless." *Olmstead*, 527 U.S. at 603. Indeed, the Court rejected a construction of the law that "would leave the State virtually defenseless once it is shown that the plaintiff is qualified for the service or program she seeks." *Id.* Thus, "the fundamental-alteration component of the reasonable modifications regulation … allow[s] the State to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Id.* at 604.

In order to meet a mandated budget cut, the Defendants had to determine how to save tens of millions of dollars in general funds in the State's Medicaid budget. *See* O'Connell Decl. at ¶ 5. The State examined whether certain service eliminations could be avoided. If the State did not unbundle ACT or eliminate peer support services, it would result in an 11% rate cut for other

services in the Magellan contract, likely resulting in disapproval from the federal government and the loss of many current Medicaid providers. *Id.* Since that was not acceptable, the Defendants instead determined to cut Medicaid rates by 4%, but that still left substantial savings that needed to be found. Unfortunately, Defendants determined that the ACT bundled services, an optional service only recently covered under Medicaid, would have to be eliminated to meet this mandate.

If the Court grants a TRO or PI and orders the Defendants to restore the ACT bundled services, other programs will have to be cut. Other programs that will likely be subject to some level of reductions or elimination, should the Court grant the TRO or PI, include additional cuts to state hospitals, which provide treatment to Idahoans in psychiatric crisis; the potential elimination of youth crisis centers, adult crisis centers, and mobile crisis units; and potential cuts to the reimbursement rates for private psychiatric residential treatment facilities, which could result in those facilities refusing to participate in Medicaid. *See id.* at ¶ 11. Defendants, faced with no good options, made the discretionary policy decision to unbundle the ACT services to meet the State's budgetary requirements. The State is pursuing reductions as evenly as possible with 4% reductions across traditional fee-for-service Medicaid and managed care rates. The State also faces challenges in meeting reduction needs outside of the behavioral health managed care contract, increasing the importance of moving forward with ACT unbundling and other changes allowed under the current law.

Importantly, this is a policy decision for the State and its political branches, not a policy decision for the federal judiciary. As the Supreme Court has recognized, "institutional reform injunctions often raise sensitive federalism concerns." *Horne v. Flores*, 557 U.S. 433, 448 (2009). Indeed, "[f]ederalism concerns are heightened when … a federal court decree has the effect of dictating state or local budget priorities." *Id.* Because "States and local governments have limited

funds," a federal court injunction requiring "that money be appropriated for one program," often has the effect of taking "funds away from other important programs." *Id.* Thus, "principles of federalism and simple common sense require the court to give significant weight to the views of the local government officials" who are tasked with making these hard budgetary decisions. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 392 n.14 (1992).[2]

As Justice Kennedy's concurrence in *Olmstead* makes clear, courts applying the *Olmstead* decision must do so with "appropriate deference to the program funding decisions of state policymakers." *Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring); *see also United States v. Mississippi*, 82 F.4th 387, 395 (5th Cir. 2023).

Here, the Defendants made the difficult but necessary decision to unbundle ACT services in light of limited resources. Defendants are entrusted with overseeing the efficient administration of limited Medicaid funds. Indeed, they are burdened with the task of making difficult policy determinations that will affect many Idaho Medicaid beneficiaries, including others suffering from mental health disabilities. State and federal law outline dozens of mandatory services outside of the Defendants' discretion. ACT is not one of these mandatory services. Accordingly, policymakers, like the Defendants, must be free to steward the State's limited resources without undue judicial interference.

Plaintiffs cite *M.R. v. Dreyfus*, 697 F.3d 706, 732 (9th Cir. 2012) for the proposition that "[t]he critical issue is whether ACT services 'are necessary to maintain Plaintiffs' mental or physical health, and to avoid serious risk of institutionalization.'" Dkt. 10-1 at 13. However, the

---

[2] Plaintiffs implicitly recognize this is a political policy question by including as Exhibit A to their Memorandum in Support of Plaintiffs' Renewed Motion for TRO and Preliminary Injunction a letter from the Idaho Sheriffs' Association to Governor Little and Legislative Leadership. Dkt. 10-2.

*Dreyfus* case recognized the Supreme Court's requirement from *Olmstead* that "the ADA requires home or community-based placement of disabled persons only if 'the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with ... disabilities.'" *Dreyfus*, 697 F.3d at 736. In that case, the Ninth Circuit faulted the State of Washington for failing to "show how fund-shifting would disadvantage other segments of the disabled population." *Id.* at 737 (cleaned up). The court held that "it is highly speculative that preliminary injunctive relief for Plaintiffs will compromise care for the rest of Washington's disabled community to such an extent that Washington's Medicaid program would be fundamentally altered." *Id.*

In the instant case, it is not speculative as to how preliminary injunctive relief for the Plaintiffs will compromise care for the rest of Idaho's disabled community. If the Court were to grant preliminary injunctive relief, the Defendants will have to impose additional cuts to other services and programs. As detailed above, these cuts will have to include cuts to or elimination of some combination of the following: state run psychiatric crisis treatment hospitals; youth and adult crisis centers and mobile crisis units; and inpatient residential treatment facilities, among other potential services. This is not a game where the Court can simply require the State to continue to provide bundled ACT services with no effects on anything, or anyone else. If the Court were to do so, other critically important services will have to be cut, or provider reimbursement rate cuts increased that will ultimately risk provider network shortages, drastically affecting other members of Idaho's disabled community.

Because Plaintiffs fail to address the fundamental alteration that would result if the Court grants the TRO/PI, because federalism concerns dictate that the Court provide substantial deference to the State's budgetary decisions, and because the ACT services are an optional service

under Medicaid and there is no requirement that they be provided to Medicaid beneficiaries, Plaintiffs have failed to show a clear likelihood of success on the merits, and have failed to even show that there is a serious question going to the merits. For this reason, the Court should deny the Plaintiffs' motion.

## II. Plaintiffs have failed to make a clear showing that they will face irreparable harm.

Plaintiffs' argument that they will be irreparably harmed in the absence of an injunction fails to acknowledge how other alternative community-based services can mitigate or wholly avoid institutionalization.

While Defendants do not, at this very early stage of proceedings, dispute the severe nature of Plaintiffs' disabilities, Plaintiffs do not adequately address the fact that many of the component services of ACT remain covered by Medicaid. *See generally* Dkt. 10-1 at 16-–17. Current ACT beneficiaries continue to have access to community-based services like crisis intervention and crisis response, psychiatric diagnostic and psychotherapy, family support and family psychoeducation, recovery coaching; behavioral health case management, targeted care coordination, intensive outpatient programs, and more. Welsh Decl., ¶ 11; O'Connell Decl. at ¶ 16. To avoid potential harm, Magellan will continue to provide intensive care coordination to members in need of assistance. Welsh Decl., ¶ 12.

## III. The balance of equities and public interest weighs against injunctive relief.

The last two factors of the preliminary injunction analysis, weighing the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. "The public interest analysis for the issuance of a preliminary injunction requires us to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *All. for the Wild Rockies*, 632 F.3d at 1138 (citation omitted).

Should the Court grant the Plaintiffs' motion, other critically important mental health services will have to be cut. Defendants will have no choice but to make these cuts in order to comply with the mandatory budgetary cut-back. Because most of the Medicaid services are required by state and federal law, the Defendants have limited optional services to cut. O'Connell Decl. at ¶¶ 10, 11, 12, 13, 15, 17. As discussed above, these cuts will have to be to some combination of the following: state mental health hospitals; cuts to reimbursement rates for residential mental health treatment programs; and cuts or elimination of adult and youth mental health crisis centers and mobile crisis units. Granting the TRO/PI in this case will inevitably harm other Idaho residents who are affected by mental health disabilities. Thus, the critical public interest in these other mental health programs will be substantially injured should the Court grant the Plaintiffs' motion in this case.

## CONCLUSION

For the foregoing reasons, this Court should deny the Plaintiff's Renewed Motion for Temporary Restraining Order and Preliminary Injunction.

DATED: December 9, 2025

        STATE OF IDAHO
        OFFICE OF THE ATTORNEY GENERAL

        /s/ *James E. M. Craig*
        JAMES E. M. CRAIG
        Chief, Civil Litigation and
        Constitutional Defense
        *Attorney for Defendants*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on December 9, 2025, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Donald Z. Gray
GIVENS PURSLEY LLP
dongray@givenspursley.com

Megann Elizabeth Meier
GIVENS PURSLEY LLP
mem@givenspursley.com

Preston N. Carter
GIVENS PURSLEY LLP
prestoncarter@givenspursley.com

Jeffrey S. Beelaert
GIVENS PURSLEY LLP
jbeelaert@givenspursley.com

*Attorneys for Plaintiffs*

/s/ *James E. M. Craig*
JAMES E. M. CRAIG