UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RAMON, by and through next friend, G.C.; THOMAS, by and through next friend, C.G.; CAMERON, by and through next friend, B.E.; ANTHONY; and WENDY, on behalf of themselves and those similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>JULIET CHARRON, in her official capacity as Director, Idaho Department of Health and Welfare; SASHA O'CONNELL, in her official capacity as Deputy Director, Idaho Department of Health and Welfare; ROSS EDMUNDS, in his official capacity as Administrator, Division of Behavioral Health,<br><br>          Defendants. | Case No. 1:25-cv-00676-AKB<br><br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 10). Plaintiffs seek injunctive relief requiring Defendants to provide Assertive Community Treatment (ACT) services to Plaintiffs and "all other patients who received these services before December 1, 2025" (Dkt. 10-1 at 3). Relatedly, they seek class certification (Dkt. 23). Defendants work for the Idaho Department of Health and Welfare (IDHW). They include IDHW's Director, Juliet Charron; its Deputy Director, Sasha O'Connell; and its administrator for the Division of Behavioral Health, Ross Edmunds. After careful consideration of the parties' oral arguments, their briefing, the evidence properly in the record, and the binding authorities, the Court concludes Plaintiffs have failed to make a clear showing they are entitled to

injunctive relief; it denies their motion for a preliminary injunction; and it denies their motion for class certification without prejudice.

## BACKGROUND

Plaintiffs include Ramon, Thomas, Cameron, Anthony, and Wendy. They each suffer from serious mental illness and qualify for Medicaid-reimbursed ACT services to treat these illnesses (Dkt. 9 at ¶¶ 17-116). Plaintiffs challenge IDHW's recent decision to "unbundle" ACT services, which refers to the way the healthcare providers bill and are reimbursed for providing the services. "Unbundled" billing means the providers bill on a fee-for-service basis; that is, they must bill individually for each component ACT service actually provided. In contrast, "bundled" billing means they bill a single fee for their services, regardless of which discrete component services were provided. At issue is whether ACT services must be "bundled" to avoid discriminating against Plaintiffs based on their mental disabilities.

Plaintiffs emphasize the importance of "bundled" services for their care. According to Plaintiffs, ACT "is a federally recognized, evidence-based, community-focused intervention model designed to treat the highest-acuity patients with mental illness such as schizophrenia, bipolar disorder with psychosis, severe and persistent mental illness with anosognosia" and who have "a history of failure with traditional mental health service models" (*id.* at ¶ 5). Plaintiffs explain that ACT "is a unique model of bundled care that provides comprehensive services to patients with serious mental problems" (Dkt. 10-1 at 3). It "provides integrated care," which "relies on a team of service providers working cooperatively to treat individual patients," and those "[m]ultidisciplinary team members coordinate with each other to develop an individualized service plan for each patient" (*id.* at 4-5). Plaintiffs describe ACT as "the treatment of last resort" (*id.*).

According to Plaintiffs, IDHW originally provided ACT services beginning in 1985 (Dkt. 20-2 at ¶ 3). In 2024, however, IDHW "privatized" ACT services by "transition[ing] from IDHW-operated teams to Medicaid-contracted providers" (Dkt. 20-1 at ¶ 7). To accomplish this transition, IDHW applied to the Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) to add ACT services to Idaho's Medicaid plan (Dkt. 10-3 at 3). In August 2024, CMS approved the amendment, retroactively effective July 2024 (*id.*).

IDHW contracts with Magellan Healthcare, Inc. (Magellan) to administer the Idaho Behavioral Health Plan (Plan), including ACT services (Dkt. 9 at ¶ 153). In turn, Magellan contracts with healthcare providers and reimburses them for providing Medicaid services, including ACT services (*id.* at ¶ 155; *see also* Dkt. 20-1 at 9 n.1). The Plan "requires that there is at least one ACT team in each Region in Idaho, totaling seven" (Dkt. 20-1 at 19). Mental Health Specialists is a provider which has contracted with Magellan to provide ACT services in Region 6 since September 2024 (Dkt. 25-1 at ¶ 3).

In August 2025, the Governor of Idaho issued an executive order impacting IDHW's budget. Executive Order 2025-05 directed IDHW (and other state agencies) "to pursue 3% general fund hold back[] from [its] FY2026 appropriation," which amounted to "a necessary reduction" of about $30 million for IDHW (Dkt. 19-1 at ¶ 4). At that time, IDHW was already "planning to request a $100 million supplemental appropriation from the legislature to achieve a balanced budget due to increased health care costs" (*id.* at ¶ 5). To comply with the Executive Order, IDHW "imposed a 4% rate cut to Medicaid reimbursement rates across the board" and "changed the reimbursement procedures for [ACT] services" (Dkt. 19 at 2).

Specifically, IDHW "submitted a budget reflecting a 4% reduction in managed care capitation rates" (*id.* at ¶ 6). As a result, Magellan's "[m]anaged care capitation rates would be

reduced by 4%" (*id.* at 7; Dkt. 19-2 at ¶ 5). Neither party explains what a "capitation rate" means in the context of ACT services. Generally, however, a capitation rate refers to the flat rate paid to healthcare providers based upon the number of patients rather than the discrete services provided. Apparently, IDHW's reduction in "capitation rates" adversely impacts providers' ability to provide "bundled" ACT services.

Here, "bundled" services refers to the way in which ACT services are billed to Magellan for reimbursement using a single billing code for all services (Dkt. 10-1 at 11). In contrast, "unbundled" means the services are billed on "a fee-for-service" basis (Dkt. 20-1 at ¶ 13). To reduce costs, IDHW "chose to 'unbundle' ACT services [by offering] Medicaid reimbursement of component services of ACT—like prescriptions and doctor visits—on an individual basis" (Dkt. 19 at 3). Accordingly, Magellan notified healthcare providers on October 31, 2025, that "the ACT services bundled billing code would no longer be available" effective December 1 (Dkt. 19-2 at ¶ 9; *see also* Dkt. 9 at ¶ 179).

In response to the "unbundling" of ACT services, Plaintiffs filed this action on November 26, 2025, alleging two claims under 42 U.S.C. § 1983 for violations of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Dkt. 1). Two days later, on November 28, Plaintiffs filed a motion for injunctive relief requesting a TRO requiring IDHW to continue providing bundled ACT services (Dkts. 4, 4-1). On December 1, the Court denied Plaintiffs' request for a TRO (Dkt. 7). It concluded Plaintiffs were unlikely to succeed on the merits of their claims because a plaintiff cannot assert a § 1983 claim against a state official to vindicate his rights under the ADA or the Rehabilitation Act and because Plaintiffs lacked allegations and factual support to show, among other things, that ACT

services could not be provided under Magellan's new billing requirements (*id.* at 6, 7) (citing *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002)).

Thereafter, Plaintiffs filed an amended complaint asserting their ADA and Rehabilitation claims directly and a renewed motion for injunctive relief, including relief on behalf of a class of ACT recipients (Dkts. 9, 10). Plaintiffs, however, did not file a motion for class certification at that time. On December 19, the Court held a hearing on Plaintiffs' renewed motion for injunctive relief (Dkt. 19). Following that hearing, Plaintiffs filed a motion for class certification seeking to certify "a class of all Medicaid-eligible patients residing in the State of Idaho with serious mental illnesses for whom [ACT] services have been recommended, provided, and reimbursed from July 1, 2024, to date" and for whom IDHW has "stopped providing those services" (Dkt. 23-1 at 2).

## LEGAL STANDARD

Under Rule 65, a party may obtain injunctive relief before a final judgment in certain limited circumstances. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Ordinarily, preliminary injunctions may go no further than necessary to provide interim relief to the parties, and any equitable remedy must not be more burdensome to the defendant than necessary to redress the plaintiff's injuries. *Labrador v. Poe by & through Poe*, ___ U.S. ___, ___, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; he is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in his favor; and an injunction is in the public interest. *Winter*, 555 U.S. at 20. The movant must carry this burden "by a clear showing." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Courts must balance the competing claims of injury and must consider the effect on

each party of the granting or withholding of the requested relief. *Winter*, 555 U.S. at 24. When the government is a party, the factors regarding public interest and equities merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The Court may apply a "sliding scale" standard, "allowing a stronger showing of one element to offset a weaker showing of another." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (2011)). Under this approach, "serious questions going to the merits" and a hardship balance that "tips sharply toward the plaintiff can support issuance of an injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1131; *see also N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024). A "serious question" is one that "cannot be resolved one way or the other at the hearing on the injunction because [it requires] more deliberative investigation." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

A plaintiff's ability to demonstrate a likelihood of success on the merits is the most important factor in determining whether a preliminary injunction should issue. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). "Once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Id.*

## ANALYSIS

### A.    Injunctive Relief

Plaintiffs assert claims under the ADA and the Rehabilitation ACT. These Acts both prohibit discrimination, and their applicable provisions are "co-extensive." *M.R. v. Dreyfus*, 697 F.3d 706, 733 (9th Cir. 2012). Accordingly, the Court analyzes Plaintiffs' claims together and focuses on the alleged ADA violation. *See id.* (analyzing ADA and Rehabilitation claims jointly).

1.      **Likelihood of Success On the Merits**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. To prove a public service or program violates the ADA, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or the public entity otherwise discriminated again him; and (3) such exclusion, denial of benefits, or discrimination was because of his disability. *Townsend v. Quasim*, 328 F.3d 511, 516 (9th Cir. 2003). Here, in determining Plaintiffs' likelihood of success on the merits, the Court considers whether Plaintiffs are likely to establish these prima facie elements.

a.      **Disability**

Plaintiffs have satisfied the first prima facie element. That Plaintiffs are disabled is not in dispute. Each Plaintiff has presented evidence that he or she suffers from serious mental illnesses. This evidence is contained in the declarations and amended declarations submitted in support of each Plaintiff (Dkts. 3-1, 3-2, 3-3, 3-4, 3-5, 12, 12-1, 12-2, 12-3, 12-6). The Court previously granted Plaintiffs' motion to seal these declarations because they contained their personal and confidential medical histories (Dkts. 3, 11, 21). For that reason, the Court does not discuss Plaintiffs' disabilities. Suffice it to state, however, that these declarations adequately detail Plaintiffs' disabilities, and IDHW does not dispute that Plaintiffs are disabled or that they qualify for ACT services (Dkt. 19 at 11) (noting "severe nature of Plaintiffs' disabilities" is not disputed).

b.    **Denial of Benefits**

Whether Plaintiffs have satisfied the second element—that IDHW has denied them benefits—presents a more challenging question. The crux of the parties' dispute regarding this element is whether ACT services can be feasibly and effectively provided as an unbundled service, i.e., billed and reimbursed on a fee-for-service basis versus under a single billing code. Plaintiffs argue that IDHW has denied them benefits by unbundling ACT services. For example they argue:

> Reimbursement for individual or unbundled traditional outpatient services—by definition—is not the same as reimbursement for ACT services because patients receiving comprehensive bundled ACT services already have demonstrated that they have *not* benefitted from services generally provided to individual patients under a traditional à la carte fee-for-service model. It defeats the entire purpose of the ACT model to suggest that providers somehow could offer patients "individual" or "unbundled" services.

(Dkt. 10-1 at 12). Further, Plaintiffs assert that by unbundling the billing for ACT services, IDHW has eliminated the benefits entirely (Dkt. 20-1 at ¶ 27 ("[T]he State did not 'unbundle ACT. The State eliminated ACT."); Dkt. 20-1 at ¶ 10 ("[T]he current service configuration is not a modification or 'unbundling' of ACT. It is the removal of ACT."); Dkt. 20-4 at ¶ 8 ("The services that remain billable under this [unbundled] structure . . . do not constitute ACT.")).

In contrast, IDHW disputes Plaintiffs' assertion that unbundling ACT services is a denial of benefits. It argues:

> Current ACT beneficiaries continue to have access to community-based services like crisis intervention and crisis response, psychiatric diagnostic and psychotherapy, family support and family psychoeducation, recovery coaching; behavioral health case management, targeted care coordination, intensive outpatient programs, and more. To avoid potential harm, Magellan will continue to provide intensive care coordination to members in need of assistance.

(Dkt. 19 at 11) (citing Dkt. 19-1 at ¶ 16; Dkt. 19-2 at ¶ 11-12). The Idaho Executive Director for Magellan, David Welsh, expressly attests that "Magellan will continue to maintain intensive care coordination to any Magellan member in need of assistance" (Dkt. 19-2 at ¶ 12).

Under Plaintiffs' argument, analyzing whether IDHW has denied them benefits is simple: According to Plaintiffs, IDHW has denied them benefits because it has unbundled ACT services, and thus they are not receiving the benefits of ACT services. The Ninth Circuit, however, has previously admonished a district court for not sufficiently considering the individualized evidence supporting each Plaintiff's claim. *Dreyfus*, 697 F.3d at 726, 730, 732. Here, an assessment of the individualized evidence of the benefits each Plaintiff is receiving or has been denied presents both a disparate and very limited picture.

None of Plaintiffs (or their guardians on their behalf) attest that they have been denied ACT benefits, although each attests they are "very fearful" of losing their access to a comprehensive support team (Dkt. 3-2 at ¶ 20; Dkt. 3-5 at ¶¶ 22-23; Dkt. 12 at ¶¶ 22-23; Dkt. 12-1 at ¶ 21; Dkts. 12-2 at ¶ 23). Meanwhile, two nurses attest they are no longer providing ACT services because of Magellan's new billing requirements. Spring Neihart is a psychiatric mental health nurse practitioner who has provided ACT services in Region 6 (Dkt. 12-6 at ¶ 2). She attests that "under Magellan's new billing requirements [she] will not be able to provide ACT services to either Wendy or Anthony" (*id.* at ¶ 4). Similarly, Anne Marshall is a psychiatric mental health nurse practitioner who has provided ACT services in Region 4 (Dkt. 12-3 at ¶¶ 2, 6). She attests that as of December 1, 2025, she has "ceased providing ACT services for Cameron" because of "Magellan's new billing requirements and unbundling of the ACT services" (*id.* at ¶ 18).[1]

Additionally, Mental Health Specialists, the ACT services provider in Region 6, disputes it can provide ACT services under Magellan's unbundled billing requirements (Dkt. 25 at ¶ 3). To

---

[1]    According to Cameron's legal guardian, Cameron "is currently institutionalized." (Dkt. 12-1 at ¶ 2). His guardian made this representation on December 2, 2025—the day after Magellan instituted the unbundled billing requirements (*id.*). Based on this timeline, it appears unlikely that Marshall was providing Cameron ACT services at the time Magellan changed its billing requirements on December 1 because he was apparently institutionalized at that time.

refute Magellan's representation that ACT services remain available despite being unbundled, Mental Health Specialists' chief executive officer, Ric Boyce, presents a "comparison chart" showing the benefits remaining "after the discontinuation of ACT services" (Dkt. 20-1 at ¶ 13). This chart is apparently based on Magellan's new billing codes.

Nevertheless, Boyce's supplemental declaration belies that the unbundling of ACT services has resulted in a complete denial of benefits. For example, Boyce states that Mental Health Services was "actively engaged with forty-four (44) ACT-qualified individuals through a multidisciplinary ACT team" at the time it received notice about the unbundling of ACT services (Dkt. 25 at ¶ 4). Since then, he attests that Mental Health Services has "been able to maintain contact" with thirty-six individuals and that six individuals "have transitioned into clinic-based services that are fully reimbursed" (Dkt. 25 at ¶ 4). Boyce, however, provides no information regarding what benefits the five Plaintiffs in this case are or are not receiving under Magellan's new, unbundled billing requirements.[2]

The Court understands Plaintiffs' position that ACT is the benefit and that if ACT is not delivered as a bundled, team-based model, then ACT "does not exist." Framing the issue in this manner, however, does not relieve Plaintiffs of their burden to demonstrate that Magellan's change in reimbursement procedures has denied each of them comparable benefits and thereby created a serious risk of institutionalization. Without evidence identifying what benefits are provided in the

---

[2]    Boyce also states that  since IDHW unbundled ACT services, "24 individuals have remained in intermittent contact"; 10 have disengaged entirely; "multiple" have "experienced psychiatric hospitalizations"; one has become homeless; and one has died from "complications" following "a minor surgical procedure" (Dkt. 25 at ¶ 4). While these unfortunate facts certainly support that the transition to unbundled services has impacted some ACT recipients adversely, they do not answer the question this Court must consider, which is whether IDHW has denied benefits to each of the five Plaintiffs in this case to an extent that each is subject to a serious risk of institutionalization.

**MEMORANDUM DECISION AND ORDER - 10**

institutional setting and which of those benefits IDHW has denied Plaintiffs due to the unbundling of ACT services, the Court cannot find IDHW's alleged denial of benefits places each Plaintiff at a serious risk of institutionalization.

Indeed, none of Plaintiffs have made a clear, individualized showing that IDHW's unbundling of ACT services has denied them comparable benefits. Rather, the record shows only that Anthony, Wendy, and Cameron are not receiving unspecified nursing services from Marshall and Neihart. Meanwhile, nothing in the record shows what benefits Thomas and Ramon have been denied. On this record, Plaintiffs have not shown a "serious question" whether IDHW is denying Plaintiffs benefits or whether unbundled ACT services under Magellan's new billing procedure provides a comparable alternative.

Plaintiffs acknowledge their benefits could be provided under a comparable alternative to ACT services. For example, Boyce attests that "in my professional opinion, removing ACT *and providing no comparable alternative* will predictably increase psychiatric hospitalization, jail involvement, emergency-department utilization, and institutional placement" (Dkt. 20-1 at ¶ 21) (emphasis added). Similarly, Stephen Weeg, who is the former IDHW director for Region 6, notes the negative consequences "when individuals with severe mental illness do not receive ACT or *comparable high-acuity services*" (Dkt. 20-2 at ¶ 7) (emphasis added). In contrast, Magellan represents it is continuing to provide coordinated benefits. Based on this record, Plaintiffs have not made a clear showing that IDHW has denied them the level of benefits necessary to avoid a serious risk of institutionalization.

c.    **Discrimination Based on Disability**

Plaintiffs' assertion that they are likely to succeed on the merits of their ADA claim focuses primarily on the third prima facie element—whether IDHW discriminated against them because of their disability. Specifically, they argue that IDHW discriminated against them because it "violated the integrated mandate recognized in in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) (Dkt. 10-1 at 13). A violation of the integrated mandate is a form of discrimination based on disability. *Townsend*, 328 F.3d at 516-17 ("In *Olmstead*, the Supreme Court interpreted the failure to provide Medicaid services in a community-based setting as a form of discrimination on the basis of disability.").

In *Olmstead*, the Supreme Court addressed the integration mandate. It explained the mandate requires a state to provide services for disabled individuals in the most integrated setting appropriate, meaning a setting that enables disabled individuals to interact with non-disabled individuals to the extent possible. *Olmstead*, 527 U.S. at 592 (citing preamble to Attorney General's Title II regulations at 28 C.F.R. pt. 35 App. A, p. 450 (1998)). The mandate involves two related regulations. *Id.*

The first regulation is commonly referred to as the integration regulation. It provides that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This regulation is intended to address "the unjustified placement or retention of persons in institutions" versus providing services in a community setting. *Olmstead*, 527 U.S. at 596.

The second, corollary regulation is commonly referred to as the reasonable modification regulation or the fundamental alteration defense. It provides that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the

basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

Considering these regulations, the Supreme Court in *Olmstead* addressed whether the ADA requires "placement of persons with mental disabilities in community settings rather than in institutions." 527 U.S. at 587. The Court stated that "unjustified isolation" in an institution "is properly regarded as discrimination based on disability" *Id.* at 597. It concluded that states are required to provide community-based treatment for persons with mental disabilities when: (1) the state's treatment professionals determine that community placement is appropriate; (2) the affected person does not oppose the transfer from institutional care to a less restrictive setting; and (3) the placement can be reasonably accommodated, taking into account the state's available resources and the needs of others with mental disabilities. *Id.* at 587.

Regarding this latter factor—the state's available resources and the needs of other mentally disabled individuals—the Supreme Court discussed the fundamental alteration defense. *Id.* at 597. It ruled that in evaluating the defense, the district court must consider the resources available to the state; the cost of providing community-based care; the range of services the state provides to others with mental disabilities; and the state's obligation to provide those services equitably. *Id.* Further, the Court stated that "the State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless" and that "sensibly construed" the fundamental-alteration defense would allow the state to show that immediate relief for the plaintiffs "would be inequitable" based on "the allocation of resources" and the state's

responsibility for "the care and treatment of a large and diverse population of persons with mental disabilities."[3] *Id.* at 603, 604.

After *Olmstead*, the Ninth Circuit considered the parameters of the integration mandate in *Dreyfus*. In that case, Washington's governor "ordered an across-the-board reduction in general fund appropriations to all state agencies" because "the state's general fund was in danger of running a deficit." *Dreyfus*, 697 F.3d at 723. As a result, each state agency was required "to reduce its allotment from the general fund by 6.287 percent." *Id.* To comply with this order, Washington's Department of Social and Health Services (DSHS) promulgated emergency regulations reducing the authorized base monthly hours of in-home personal services care. *Id.*

The plaintiffs in *Dreyfus*, who were recipients of these in-home personal services, sued DSHS alleging the regulation violated the ADA and the Rehabilitation Act and requested a preliminary injunction. *Id.* at 724. Reversing the district court's denial of this request, the Ninth Circuit ruled that to show a violation of the integration mandate, "[a] plaintiff need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care. Rather, a plaintiff need only show that the challenged state action creates a serious risk of institutionalization." *Id.* at 734.

The *Dreyfus* Court also addressed the fundamental alteration defense. *Id.* at 736. It ruled that "budgetary concerns alone do not sustain a fundamental alteration defense" and that a defendant "must show how fund-shifting would disadvantage other segments of the disabled

---

[3]    The Supreme Court made these latter statements in that portion of *Olmstead* opinion which is a plurality. The Ninth Circuit has concluded, however, that this plurality opinion "controls." *Townsend v. Quasim*, 328 F.3d 511, 519 n.3 (9th Cir. 2003); *see also Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1182 (10th Cir. 2003) (noting courts are to consider whether immediate relief would be inequitable based on allocation of available resources and state's responsibility for other disabled persons).

MEMORANDUM DECISION AND ORDER - 14

population." *Id.* at 737 (cleaned up). It noted that DSHS "did not identify specific programs that would necessarily be cut if all or part of the challenged regulation were preliminarily enjoined." *Id.* (cleaned up). For example, DSHS "was unable to say with certainty whether the cuts would necessarily come from Medicaid programs, or whether cuts would be made to some other portion of Washington's budget." *Id.* Under these circumstances, the Ninth Circuit concluded that it was "highly speculative that preliminary injunctive relief for [the plaintiffs would] compromise care for the rest of Washington's disabled community to such an extent that Washington's Medicaid program would be fundamentally altered." *Id.*

Here—assuming for argument's sake that Plaintiffs had shown a denial of ACT services without a comparable alternative—Plaintiffs have shown a serious risk of institutionalization. Specifically, they have submitted declarations stating that individuals who have severe mental issues, like Plaintiffs' issues, are at serious risk of institutionalization if they do not receive ACT or comparable services (*see, e.g.*, Dkt. 20-1 at ¶ 26 ("In my professional opinion, removing ACT and substituting these services places individuals at serious and foreseeable risk of institutionalization, including psychiatric hospitalization, incarceration, and homelessness."); Dkt. 20-2 at ¶ 7 ("[T]he consequences when individuals with severe mental illness do not receive ACT or comparable high-acuity services [includes] repeated and prolonged settings, loss of housing, avoidable involvement with the criminal-justice system, and, in some cases, preventable deaths."); Dkt. 12-3 at ¶ 9 ("Without ACT involvement, these individuals commonly experience psychiatric decompensation, recurrent hospitalization, incarceration, homelessness, exploitation, untreated medical issues, and in some cases premature death."); Dkt. 12-6 at ¶ 13 ("[R]emoving ACT services places Wendy at significant risk of both short-term and long-term hospitalization.")).

That Plaintiffs may be subject to a serious risk of institutionalization, however, does not conclude the integrated mandate analysis. Rather, the Court must also consider the fundamental alteration defense. *Disney Enters.*, 869 F.3d at 856 (requiring consideration of affirmative defense when considering whether preliminary injunction is appropriate). Here, IDHW has shown more than "budgetary concerns." *See Dreyfus*, 697 F3.d at 736 (stating "budgetary concerns alone do not sustain a fundamental alteration defense").

For example, IDHW has shown that it is responsible for the care and treatment of a large and diverse population of mentally disabled Idahoans. Further, it has shown that granting Plaintiffs' relief "will compromise care for the rest of Idaho's disabled community" because it will require IDHW to cut or eliminate a combination of services for other mentally disabled individuals, including "state run psychiatric crisis treatment hospitals; youth and adult crisis centers and mobile crisis units; and inpatient residential treatment facilities, among other potential services" (Dkt. 19 at 10; *see also* Dkt. 19-1). Based on this showing, it is not speculative that granting Plaintiffs' relief would compromise other mentally disabled Idahoans. Rather, IDHW has clearly shown that unless it unbundles ACT services, it must compromise the care for other mentally disabled individuals.

Plaintiffs do not dispute that the Court must consider the fundamental alteration defense. Rather, they acknowledge IDHW's obligation to provide and equitably administer care for other mentally disabled individuals (Dkt. 20 at 6). They argue, however, that they are not asking for IDHW to "allocate limited funds to one program, while taking funds away from other important programs" (*id.*). Instead, they explain they are asking for a preservation of "the status quo" (*id.* at 8). This argument, however, ignores that to preserve the status quo will necessarily require IDHW to reduce or eliminate benefits for other mentally disabled Idahoans. Accordingly, for purposes of injunctive relief, the Court concludes that IDHW has shown they are likely to succeed on their

fundamental alteration defense and that Plaintiffs have not refuted that defense. Because Plaintiffs have not clearly shown they have been denied comparable benefits and have not refuted IDHW's fundamental alteration defense, the Court concludes that for purposes of preliminary injunctive relief, Plaintiffs are not likely to succeed on the merits of their ADA claim.

### 2.    Irreparable Harm

The Ninth Circuit has ruled that "beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care." *Dreyfus*, 697 F.3d at 732 (cleaned up). It explained that "the critical issue is whether the services are necessary to maintain [the plaintiffs'] mental or physical health and to avoid serious risk of institutionalization." *Id.*

Plaintiffs argue that "given the seriousness of their mental illnesses and their historical struggles with mental health," even a temporary interruption in ACT services threatens hospitalization and is an irreparable injury (Dkt. 10-1 at 16). In support, they explain Ramon's and Thomas's diagnoses, their mental health struggles, and their success since receiving ACT services (*id.* at 16-17). Plaintiffs' argument regarding irreparable harm, however, does not address Cameron, Wendy, or Anthony (*see id.*).

In response, IDHW argues that "Plaintiffs do not adequately address the fact that many of the component services of ACT remain covered by Medicaid" (Dkt. 19 at 12). The Court agrees. For the reasons discussed above, if unbundled ACT services provide a comparable alternative to bundled ACT services, then those services may be adequate to maintain Plaintiffs' health and allow them to avoid institutionalization. Based on the current record, Plaintiffs have not clearly shown that unbundled ACT services are not a comparable alternative for their care and that they will be irreparably injured because IDHW unbundled ACT services.

### 3.    Balance of Equities and Public Interest

Plaintiffs argue that the balance of equities and public interest weighs in their favor because "[w]ithout ACT services, [they] face serious hardships [and] likely will be incarcerated or face prolonged hospitalization or institutionalization because of their mental illnesses" (Dkt. 10-1 at 18). Further, they argue that, although "the State of Idaho has a strong public interest in balancing its budget," "it is unclear [how] cutting ACT services actually saves money given the cost of the state institutionalizing Plaintiffs" (Dkt. 10-1 at 19). Plaintiffs, however, have offered limited evidence suggesting that eliminating bundled ACT may increase downstream costs associated with hospitalization, incarceration, or institutional placement.

In response, IDHW argues the balance of equities and public interest weighs in its favor (Dkt. 19 at 11-12). Specifically, it argues that if the Court orders it to continue providing bundled ACT services it "will have no choice" but to cut or eliminate benefits for other mentally disabled Idahoans and that "the critical public interest" in those other programs would "be substantially injured" (*id.* at 12). Based on the current record, the Court finds the balance of equities and public interest is basically equal between the parties.

In summary, the Court concludes Plaintiffs have failed to make a clear showing that they have been denied benefits comparable to ACT services, to refute that granting them relief will require IDHW to cut or eliminate programs which will jeopardize the care for other mentally disabled individuals, and to show that each of them will be irreparably harmed. Accordingly, it denies Plaintiffs' request for injunctive relief.

### B.    Class Certification

Plaintiffs seek to certify a class of "all Medicaid-eligible patients residing in the State of Idaho with serious mental illnesses for whom [ACT] services have been recommended, provided, and reimbursed from July 1, 2024," and which IDHW has stopped providing as of December 1, 2025 (Dkt. 23-1 at 2).[4] Rule 23(a) of the Federal Rules of Civil Procedure requires a plaintiff seeking class certification to demonstrate affirmatively that the proposed class meets four threshold requirements: (1) numerosity—the class is so large that joinder of all members is impracticable; (2) commonality—one or more questions of law or fact is common to the class; (3) typicality— the named parties' claims are typical of the class; and (4) adequate representation—the class representatives will fairly and adequately protect the interests of other class members. *Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018).

In resolving a motion for class certification, a district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). This "rigorous" evaluation, however, is not a mini trial. *Sali*, 909 F.3d at 1004. "A district court need only consider material sufficient to form a reasonable judgment on each [Rule 23] requirement," and "[t]he court's consideration is not limited to only admissible evidence." *Id.* at 1005.

Because the Court denies Plaintiffs' motion for injunctive relief, it does not need to address their motion for class certification at this time. Regardless, the Court has concerns about certifying a class on the present record. For example, whether the five Plaintiffs could adequately represent all Medicaid-eligible patients who are qualified to receive ACT services in Idaho is unclear.

---

[4]    The class Plaintiffs propose in their motion for class certification differs somewhat from the proposed class in their Amended Complaint (*compare* Dkt. 9 at ¶ 195 *with* Dkt. 23-1 at 2).

**MEMORANDUM DECISION AND ORDER - 19**

Each Plaintiff's disability is unique. Their mental illnesses and symptoms differ significantly. Their diagnoses include one or more of the following illnesses: schizophrenia, bipolar type 1 and 2, multiple personality disorder, attention deficit/hyperactivity disorder, and substance use disorder. Their different diagnoses and symptomology likely account for their differing circumstances. For example, two live independently, one attends college, one is institutionalized, one resides in an assisted living facility, and one is subject to homelessness. Some have the capacity to represent themselves in this action, while others do not and have appointed legal guardians. Also, determining whether each Plaintiff is facing a serious risk of institutionalization and the necessary care to avoid that risk will require a fact-intensive inquiry which is generally not conducive to a class action. *See Olmstead*, 527 U.S. at 587 (noting individual nature of *Olmstead* factors including determining appropriateness of community placement and whether person opposes institutionalization); *K.W. v. Armstrong*, 180 F. Supp. 3d 703, 721-22 (D. Idaho 2016) (noting fact intensive inquiry of *Olmstead* determination).

Further, Plaintiffs do not appear to represent all the Regions at issue. The record suggests that Cameron is in Region 4 and that Anthony and Wendy are in Region 6 (*see* Dkt. 12-3 at ¶¶ 2, 6, 18 (stating Marshall is in Region 4 and provided services to Cameron); Dkt. 12-6 at ¶¶ 2, 4 (stating Neihart is in Region 6 and provided services to Wendy and Anthony)). The record, however, does not provide any evidence regarding what is occurring in the other five Regions (*see* Dkt. 20-1 at 19) (noting Idaho Behavioral Health Plan "requires that there is at least one ACT team in each Region in Idaho, totaling seven"). As stated above, however, the Court does not resolve class certification issues at this time.

## ORDER

IT IS HEREBY ORDERED that:

      1.     Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 10) is **DENIED**.

      2.     Plaintiffs' Motion for Class Certification and/or for Provisional Class Certification (Dkt. 23) is **DENIED** without prejudice.

DATED: January 05, 2026

Amanda K. Brailsford
U.S. District Court Judge